942 So.2d 471 (2006)
Wayne COSBY, Kari Fitzgerald, John Fitzgerald, Stan McDonald, Keith Stevens, Karen Williams, Carl Williams, and Peter Oelschlaeger
v.
HOLCOMB TRUCKING, INC., Henry H. Holcomb, and Joyce M. Holcomb.
No. 2005-C-0470.
Supreme Court of Louisiana.
September 6, 2006.
Rehearing Denied December 15, 2006.
*472 Ernest M. Forbes, Jr., Denham Springs, for Applicant.
David O. Mooney, Baton Rouge, for Respondent.
VICTORY, J.
We granted this writ application to determine whether the court of appeal erred in reversing a trial court determination that this action to enforce a building restriction had not prescribed. After oral argument, we requested further briefing on whether the applicable building restrictions form part of a general plan as required by Louisiana Civil Code Article 775. Upon further review of the record and the applicable law, we reverse the judgment of the court of appeal and reinstate the judgment of the trial court on the original grounds upon which this writ was granted. The trial court's determination that this action was filed within the two-year time period because the violations of the building restrictions were not noticeable until 2001 was not manifestly erroneous.

FACTS AND PROCEDURAL HISTORY
In 1982, William Monroe King, Jr. and his wife Shirley Martin King developed Wedgewood Acres Subdivision ("Wedgewood Acres") in rural Livingston Parish. Contemporaneously with that development, the Kings established building restrictions for Wedgewood Acres, and on December 15, 1982, they filed the restrictions in the Livingston Parish public records.
Two years later, the Kings, along with other family members, Darron and Michele King, developed four rural tracts of land adjoining Wedgewood Acres along Ben Fuglar Road (the "Front Lots") in Livingston Parish. As part of that development, the Kings established a building restriction agreement expressly stating that with the exception of the set-back restrictions, "[a]ll other restrictive covenants shall be exactly as provided in the restrictive covenants for Wedgewood Acres Subdivision as per said [recorded] restrictions." On May 22, 1984, the Kings filed this second restrictive covenant agreement in the Livingston Parish public records.
The provisions of the restrictive covenants pertinent to the present case are:

1.
All tracts are hereby designated as residential, and they shall be used for none other than residential purposes. No building shall be erected, altered, placed or permitted to remain on any tract, other than one single-family dwelling, not to exceed two and one-half stories in height, with the usual and appropriate out buildings, enclosed barns, and private garage and/or carports designed to house no fewer than two automobiles.
* * *
7.
No house trailers, buses, commercial vehicles or trucks shall be kept, store[d], *473 repaired, or maintained on any lot, servitude or right-of-way in any manner which would detract from the appearance of the subdivision. No structure of any temporary character, trailer, basement, tent, shack, or other out-building shall be allowed on any tract for a prolonged period of time so as to detract from the appearance of the subdivision, unless approved by developer.
* * *
16.
No building or structure shall be used to operate any commercial activity on any tract, and no commercial activity shall be conducted from any lot in this subdivision, unless approved by developer.
In 1985, Harry[1] and Joyce Holcomb acquired Lot "P" in Wedgewood Acres, but never built on the property. On January 9, 1985, William M. King, Jr., individually, executed an authentic act wherein he: (1) "grant[ed] permission to [Harry H. Holcomb, Jr.] to enter through public access and park on his premises his truck used in his profession;" (2) permitted him to "maintain this truck for normal maintenance but cannot enter into commercial maintenance in any form;" and (3) allowed him "to construct and maintain a permanent structure for the housing of this truck as long as it is built to other subdivision restrictions and does not detract in any manner from the appearance of the subdivision. Detraction from the general appearance of the subdivision shall be determined by the developer." In exchange, Holcomb agreed "not to haul loads in excess of 50 thousand pounds into Wedgewood Acres except pre-sold loads to other landowners."
Subsequently, on June 18, 1992, the Holcombs exchanged Lot "P" for one of the Front Lots on Ben Fugler Road. Harry Holcomb testified no search of the Livingston Parish public records was made prior to the exchange. In 1993, the Holcombs constructed a home on the newly exchanged lot and approximately four years later, they constructed a 40' × 40' steel outbuilding[2] on their lot for use in connection with their trucking company, Holcomb Trucking, Inc. Traditionally, the Holcombs serviced their vehicles at a shop they leased in Livingston Parish. After the construction of the steel building on their lot along Fugler Road, they terminated this shop lease and started bringing trucks onto their Fugler Road lot for maintenance and service.[3] He testified that none of the trucks are regularly parked at the residence and only general maintenance and minor vehicle repairs, i.e., oil changes, truck lubrication, and brake adjustments, are conducted in the shop. Additionally, the Holcombs also regularly use pressure washers to wash down at least one truck per weekend outside the shop on their property.
On February 20, 2002, eight of the Holcombs' neighbors filed these proceedings, alleging the Holcombs keep, store, repair and maintain one or more commercial vehicles and operate a commercial business on their property in violation of the 1984 restrictive covenants. The neighbors further claimed the continuing disturbance to *474 the neighborhood caused by the Holcombs' trucking business violates the provisions of La. C.C. art. 667. On June 30, 2002, after this litigation began, Holcomb obtained and recorded a document in which William M. King, Jr. declared that the exemption Holcomb originally obtained on January 9, 1985, from the commercial activity provisions applicable to Wedgewood Acres, was applicable to his lot on Fugler Road. In that document, King further stated, in an effort to "clarify" the earlier agreement, that Holcomb was permitted to: operate his trucking business; bring in trucks and trailers for Holcomb, Inc. for cleaning and maintenance; maintain the outbuildings needed to operate the trucking business; have third parties deliver parts and materials for the operation of the business; and, engage in any other activities needed for the operation of the trucks and trailers.[4]
The Holcombs responded to the petition with peremptory exceptions of no right of action[5] and prescription. After conducting a contradictory hearing at which evidence was introduced, the trial court overruled the peremptory exceptions.[6] After a trial on the merits on the defendants' violation of the building restrictions,[7] the trial court granted a preliminary injunction, prohibiting the Holcombs from bringing commercial vehicles *475 or trucks on their property in the Front Lots and from engaging in commercial activity on the property, excepting specified business communications.[8]
The Holcombs appealed, seeking review of several issues, including the trial court's denial of their peremptory exception of prescription. Applying article 781, the appellate court found no reasonable factual basis for the trial court's finding the Holcombs' activities were not noticeable and apparent to the public until the spring of 2001 and reversed the trial court's denial of the Holcombs' peremptory exception of prescription. Cosby v. Holcomb, 03-2423 (La.App. 1 Cir. 12/17/04), 890 So.2d 35 (unpublished opinion). Accordingly, it found the plaintiffs' suit filed on February 20, 2002, "over four years after `the commencement of a noticeable violation'" was time-barred and the Holcombs' property was freed of the pertinent restrictive covenants that had been violated. Id. We granted the plaintiffs' writ application. Cosby v. Holcomb, 05-0470 (La.5/6/05), 901 So.2d 1078.

DISCUSSION
In 1977, the Louisiana Legislature enacted a new Title V of Book II of the Louisiana Civil Code regulating building restrictions. Accordingly, Articles 775-783 of the Louisiana Civil Code now define and govern building restrictions. Because prior to 1977 the Civil Code did not specifically address building restrictions, these new articles generally codified the existing jurisprudence.
Building restrictions are defined as "charges imposed by the owner of an immovable in pursuance of a general plan governing building standards, specified uses, and improvements." La. C.C. art. 775. "The plan must be feasible and capable of being preserved." La. C.C. art. 775. "The law is clear that building restriction clauses constitute real rights, not personal to the vendor, and inure to the benefit of all other grantees under a general plan of development, and are real rights running with the land; and that the remedy of the other grantees to prevent a violation of the restrictions by another is by injunction." Oakbrook Civic Ass'n, Inc. v. Sonnier, 481 So.2d 1008, 1010 (La.1986) (citing Edwards v. Wiseman, 198 La. 382, 3 So.2d 661 (1941)). "Building restrictions may impose on owners of immovables affirmative duties that are reasonable for the maintenance of the plan." La. C.C. art. 778.
When this case was filed and argued to the lower courts and to this Court, there was no dispute that the building restrictions constituted a general plan of development which was properly filed and which gave constructive knowledge of its contents to all prospective purchasers. The defenses presented by the Holcombs in their peremptory exceptions were that a certain plaintiff had no right to pursue an action based on the restrictive covenants applicable to the Front Lots, and that the plaintiffs' action had prescribed. On appeal, the only issues raised by defendants other than the above issues, were that King granted them a waiver from the restrictive covenants and that the trial court erred in granting an injunction if the injunction *476 was based on La. C.C. Arts. 667, 668, and 669. Sua sponte, this Court asked the parties to brief the issue of whether the restrictive covenants constituted a general plan in light of Le Blanc v. Palmisano, 43 So.2d 263 (La.App. Orl.1949), which held that a restrictive covenant did not run with the land because whether or not property could be used for commercial purposes was "contingent entirely upon the caprice" of the developer.
After further review, we find that this appellate court case is not dispositive and that the mere fact that certain restrictions can be waived by the developer does not ipso facto make the restrictive covenants unenforceable as such. For instance, in an analogous case, we explained as follows:
There is a conflict in the circuit courts as to whether a building restriction requiring approval of construction plans by a neighborhood committee, when no guidelines or very general guidelines for approval are provided, is enforceable in this state. The Fourth and Third Circuits have held that such restriction is unenforceable because it is too vague, indefinite and ambiguous. Lake Forest, Inc. v. Drury, 352 So.2d 305 (La.App. 4 Cir.1977), writ denied, 354 So.2d 199 (La.1978); Community Builders, Inc. v. Scarborough, 149 So.2d 141 (La.App. 3 Cir.1962). The Second Circuit and the First Circuit, until the instant case, have upheld such a provision, determining the validity of the enforcement by the reasonableness of the committee's actions. Jackson Square Towne House Homes Ass'n, Inc. v. Mims, 393 So.2d 816 (La. App. 2 Cir.1981); 4626 Corp. v. Merriam, 329 So.2d 885 (La.App. 1 Cir.), writ refused, 332 So.2d 800 (La.1976). The majority of the states which have considered the issue have held that covenants requiring submission of plans and consent before construction are valid and enforceable, even though they vest the approving authority with broad discretionary powers, so long as the authority to consent is exercised reasonably and in good faith.
We think that the applicable rule in the instant case should be that where the power is granted to a committee to approve or disapprove the erection of a building based on a standard of whether it conforms to the harmony of external design and location in relation to the surrounding structures and topography, such a standard is not ambiguous and is enforceable, provided that the authority is exercised reasonably and in good faith.
Oakbrook, supra at 1011-12.[9]
While the restrictions in Oakbrook dealt with the discretion to approve of construction plans by a neighborhood committee, and some of the restrictions in this case arguably deal with the discretion to approve of certain types of commercial activity by the developer, the relevant issue in both cases is whether the fact that certain of the restrictions are not absolute and are subject to the discretion of a third party negates the finding of a general plan. In Oakbrook, this Court found that as long *477 as the discretionary power is exercised reasonably and in good faith and is based on a standard that is unambiguous, the restrictions were enforceable.
In this case, plaintiffs' complaint is that the Holcombs are bringing commercial trucks onto their property and servicing them there. Section 7 of the building restrictions provides that "[n]o . . . commercial vehicles or trucks shall be kept, store[d], repaired, or maintained on any lot, servitude or right-of-way in any manner which would detract from the appearance of the subdivision." This restriction is not subject to the discretion of the developer at all, therefore whether it constitutes part of a general plan is not at issue. Section 16 also appears to have been violated by the Holcombs' servicing of their trucks on their property. Section 16 provides that "[n]o building or structure shall be used to operate any commercial activity on any tract, and no commercial activity shall be conducted from any lot in this subdivision, unless approved by developer." There may be disagreement on whether the phrase "unless approved by developer" applies to both phrases in this sentence, or just the second phrase. However, whatever commercial activity may or may not be allowed based on the discretion allowed the developer, there is no doubt that such commercial activity cannot include keeping, storing, repairing, or maintaining commercial vehicles or trucks in such a manner as would detract from the appearance of the subdivision. Thus, not only did no party allege to the lower courts or to this Court that the building restrictions did not constitute a general plan, the activity complained of in this case, servicing and maintaining commercial trucks on the property in a manner which detracts from the appearance of the subdivision, was not subject to the discretion of the developer in any event and is strictly prohibited. Thus, we need not consider this issue further.
The only issue assigned as error in this case, and the reason we granted this writ, is whether the court of appeal correctly applied the appropriate standard of review in reversing the trial court's factual determination that this case had not prescribed. La. C.C. art. 781 provides:
No action for injunction or for damages on account of the violation of a building restriction may be brought after two years from the commencement of a noticeable violation. After the lapse of this period, the immovable on which the violation occurred is freed of the restriction that has been violated.
As stated in this Official Comments to this Article, "[t]his prescription does not merely bar actions for the enforcement of building restrictions as sui generis real rights; it extinguishes the real right itself in the same way that the prescription of nonuse extinguishes the right of a servitude." La. C.C. art. 781, Official Revision Comments (b).
The plaintiffs filed this suit on February 21, 2002. Six witnesses testified at trial regarding the time of the commencement of a noticeable violation. Wayne Cosby, who lives behind and two lots to the east of the Holcombs, testified that he first noticed the trucking business operations in the spring or early summer of 2001 when he noticed trucks being pressure washed on the Holcombs' property. Stan McDonald, who lives four houses down from the Holcombs, testified that in the late spring of 2001, he first heard a truck being pressure washed. A few weeks after that, he was forced off to the side of the road because of an advancing commercial truck. Subsequently, he asked a driver of one of the trucks what he was doing and the driver said, "we have a shop down there where we get our trucks worked on." He *478 testified that he never noticed any trucking business activity before 2001. Carl Williams, who lives three houses down from the Holcombs, testified that he first noticed the trucks being serviced on the property in April of 2001 when he noticed a truck being pressure washed. After that, he began noticing more activity, such as "banging on the tire . . . changing tires, and stuff like that."
Harry Holcomb testified that "immediately after the shop was finished" in September of 1997, he began using the facility for the repair and maintenance of the company's eighteen-wheel trucks. Mr. Holcomb offered documentary evidence to establish that commercial tire companies came to the lot several times in 1997 and 1998 to repair and install tires on the eighteen-wheelers. Mr. Holcomb testified that he does not house his eighteen-wheelers at the shop; however, on average, an eighteen-wheeler is washed on the property once every week, and an oil change is done every month. He indicated that although oil changes take place within the confines of the shop, the trucks are washed outside of the building and that this takes between two and three hours. However, on cross-examination, he acknowledged that in his pre-trial deposition he testified that he did not begin to use the shop for servicing his trucks "until the last 18 months or two years." William King, who is the Holcombs' friend but who does not live in the same neighborhood, testified that Mr. Holcomb worked on some vehicles in his driveway in 1997. Randolph Hall, who lives next door to the Holcombs, testified that after the shop was built in 1997, Mr. Holcomb brought a truck to his home "most every week;" but later testified that the truck activities were no longer frequent. Further, on cross examination, he testified that he does not know exactly when the defendants started these operations, and that if Mr. Holcomb testified in his pretrial deposition that he started this activity only within 18 months or two years before his deposition, he would agree with that too.
In its written Reasons for Judgment, the trial court ruled:
The Court finds that plaintiffs became aware that the defendants were operating a trucking business out of their residence sometime in early 2001. The defendants testified that although he had been in the trucking business for 35 years, he had not run the business from the Ben Fugler Road residence during that entire time. Defendant further testified that he built a shop on his property but did not use it to bring trucks in right away.
Plaintiffs testified that they only noticed the trucking company activity and noise from washing the trucks on weekends in the year 2001. Prior to 2001, plaintiffs testified that they heard or saw nothing that would indicate a trucking company was operating in the shop on Ben Fugler Road. Carl Williams testified that he was planting flowers in April 2001 when he noticed the sound of the pressure washer and banging. Other neighbors testified that they had been in the shop and not noticed a trucking business being operated there.
It appears that the trucking business was first noticed to be active sometimes in April 2001. Suit was filed February 20, 2002. Accordingly, plaintiffs suit has not prescribed.
Reviewing the record and the trial court's factual findings under the manifest error standard, the court of appeal concluded:
Taking into account the testimony and documentary evidence in the record, we find no reasonable factual basis for a finding that the Holcombs' activities *479 were not noticeable and apparent to the public until the spring of 2001. There is testimony from two witnesses, one of whom lives next door to the Holcombs, that the Holcombs had been using their shop for repair and maintenance of eighteen-wheelers since late 1997. Thus, the two-year peremptive period found in Article 781 began to run at that time, over four years after "the commencement of a noticeable violation." La. Civ.Code art. 781. Accordingly, the plaintiffs' cause of action for injunctive relief was perempted at the time of the filing of suit. Moreover, pursuant to Article 781, the Holcombs' property is freed of the pertinent restrictive covenants that had been violated.
Cosby v. Holcomb, supra, 890 So.2d 35.
Under the manifest error standard of review, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Smith v. Louisiana Dept. of Corrections, 93-1305 (La.2/28/94), 633 So.2d 129, 132; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Id. The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. Id.; Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217 (La.4/3/02), 816 So.2d 270, 278-79. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Id. However, where documents or objective evidence so contradict the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based on a credibility determination. Rosell, supra at 844-45. But where such factors are not present, and a fact finder's finding is based on its decision to credit the testimony of one or two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Id.
Here, three witnesses testified that they did not notice the trucks coming onto the Holcombs property to be serviced until the spring of 2001. This provides a reasonable factual basis for the trial court's finding that a noticeable violation first occurred in 2001 and therefore, the case has not prescribed. While Mr. Holcomb testified that some commercial truck activity occurred on his property beginning in 1997, he also testified that he really did not begin to use the property for this activity until 18 months before his deposition testimony. Further, while two witnesses testified that trucking activity began on the property before 2001, the trial court evidently discredited this testimony and believed the testimony of the other witnesses instead, finding that a noticeable violation of the building restrictions did not occur until 2001. This is a typical case where there were two permissible views of the evidence and the fact finder chose one. Generally, credibility determinations are the sole province of the trial court. Thus, the court of appeal erred in substituting its judgment for the judgment of the trial court.

DECREE
For the reasons stated herein, the judgment of the court of appeal is reversed, the judgment of the trial court is reinstated, and the case is remanded to the court of appeal for consideration of the remaining *480 assignments of error consistent with the reasoning of this opinion.
REVERSED AND REMANDED TO THE COURT OF APPEAL.
JOHNSON, J., concurs.
KNOLL, J., dissents and assigns reasons.
KNOLL, Justice, dissenting.
With all due respect to my colleagues, I dissent. In my view the building restrictions in this case fall far short of a real right running with the land. The building restriction's prohibition against the operation of commercial activity on the tract, as well as the proscription against the storage, repair or maintenance of commercial vehicles or trucks, was left entirely to the whim or caprice of the developers which renders a general plan ineffective, and ignores the requirements of LA. CIV.CODE ANN. art. 775.
The majority skirts this issue and frames the issue as to whether the commercial activity "detracts from the appearance of the subdivision, [which] was not subject to the discretion of the developer in any event and is strictly prohibited." I find resolving the issue in this manner troubling and an incorrect approach to this case. While the issue of whether the building restrictions constituted a general plan was not raised in the lower courts, in my view we cannot engage in a proper analysis on any issue raised concerning building restrictions unless the building restrictions constitute a valid general plan that is a real right running with the land. The majority's feigned attempt to analyze this case under an "appearance of the subdivision" is internally inconsistent when the alleged offending appearance is commercial activity that is prohibited by the building restrictions unless allowed at the whim of the developers. I find this approach unreasonable and ignores the dictates of LA. CIV.CODE ANN. art. 783, which requires us to resolve doubt as to the existence, validity or extent of building restrictions in favor of the unrestricted use of the immovable.
The existence of a general plan that is "feasible and capable of being preserved" is a threshold requirement for the creation of building restrictions as sui generis real rights. LA. CIV.CODE ANN. art. 775. Without such a plan, building restrictions are simply not sui generis real rights. See McGuffy v. Weil, 240 La. 758, 125 So.2d 154 (1960). Failure to provide for the uniformity of the restrictions may vitiate a general development plan. See Murphy v. Marino, 60 So.2d 128 (La.App. 1 Cir.1952).
In Murphy, the court stated:
It is our understanding of the law that in order to create a binding covenant running with the land in a subdivision, and enforceable by any purchaser of property therein, there should be a uniform plan of restriction applicable to the subdivision as a whole, or to a particular part of the subdivision, known to each purchaser and thereby, by reference or implication, forming a part of his contract with the subdivider. . . .
26 Corpus Juris Secundum, Deeds, § 167, pages 552 and 553, covers the above point as follows:
`A general building scheme may be defined as one under which a tract of land is divided into building lots, to be sold to purchasers by deeds containing uniform restrictions. * * * In determining whether land is included in a building scheme, doubts are to be resolved in favor of the free use and enjoyment of the property and against restrictions. * * * The right to enforce restrictions imposed pursuant to a general scheme must be universal or *481 reciprocal, that is, the same restrictions must apply substantially to all lots of like character or similarly situated, and the scheme must be incorporated in all the deeds.'
Murphy, 60 So.2d at 130. See also Richard v. Broussard, 378 So.2d 959 (La.App. 3 Cir.1979) (finding a building restriction did not exist because the original landowner did not have an orderly subdivision plan); Herzberg v. Harrison, 102 So.2d 554 (La. App. 3 Cir.1958) (holding that "[b]uilding restrictions are valid and enforceable where inserted in deeds in pursuance of a general plan devised by the ancestor in title to maintain certain building standards"); In re: Congregation of St. Rita Roman Catholic Church, 130 So.2d 425 (La.App. 4 Cir.1961) (restrictions on 40 percent of the lots does not constitute a general plan).
Particularly germane is LeBlanc v. Palmisano, 43 So.2d 263 (La.App.Orl.1949). In LeBlanc, property owners in the Claiborne Gateway Subdivision sued the defendant, requesting injunctive relief to prohibit him from erecting a tourist court on property he owned in the subdivision in violation of a title restriction or covenant running with the land. The particular restriction at issue provided:
No building shall be constructed to cost less than two thousand dollars. No commercial property shall be permitted to be constructed or occupied as such on this property except by written consent of the [developer] Claiborne Avenue Extension Realty Company, Inc.
In its affirmation of the trial court's denial of the plaintiffs' application to restrain the defendant from erecting commercial buildings on the property, the appellate court stated:
The law is clear that building restriction clauses constitute real rights, not personal to the vendor, and inure to the benefit of all other grantees under a general plan of development, and are real rights running with the lands; and that the remedy of the other grantees to prevent a violation of the restrictions by another is by injunction. Queensborough Land Company v. Cazeaux et al., 136 La. 724, 67 So. 641, L.R.A.1916B, 1201, Ann.Cas.1916D, 1248; Hill v. Wm. P. Ross, Inc., 166 La. 581, 117 So. 725, and Ouachita Home Site & Realty Co. v. Collie et al., 189 La. 521, 179 So. 841.' Edwards v. Wiseman, 198 La. 382, 3 So.2d 661, 663.
In our opinion, however, a casual reading of this restriction indicates that it is not a covenant running with the land, but is a personal covenant between the vendor, Claiborne Avenue Extension Realty Company, Inc., and Henry M. Rahders, the predecessor in title of defendants.
A covenant runs with the land when not only the original parties or their representatives, but each successive owner of the land, will be entitled to its benefit, or be liable, as the case may be, to its obligations. It is so called when either the liability to perform it or the right to take advantage of it passes to the assignee of the land. Real covenants relate to realty and have for their main object some benefit thereto, inuring to the benefit of and becoming binding on subsequent grantees, while personal covenants do not run with the land. Whether or not certain property in this subdivision shall be used for commercial purposes is contingent entirely upon the caprice of the Claiborne Avenue Extension Realty Company, Inc., and, therefore, this covenant did not run with the land for the *482 benefit of the purchasers or grantees of property in this subdivision.

LeBlanc, 43 So.2d at 265-66 (Emphasis added).
In the present case, two of the building restrictions at issue closely parallel the covenant found unenforceable in LeBlanc because the restriction did not constitute a general plan governing building restrictions for the subdivision. The two provisions William M. King, Jr., his wife, and other family members adopted for Wedge-wood Acres and the Front Lots on Fugler Road state:
7.
No house trailers, buses, commercial vehicles or trucks shall be kept, store[d], repaired, or maintained on any lot, servitude or right-of-way in any manner which would detract from the appearance of the subdivision. No structure of any temporary character, trailer, basement, tent, shack, or other out-building shall be allowed on any tract for a prolonged period of time so as to detract from the appearance of the subdivision, unless approved by developer.

* * *
16.
No building or structure shall be used to operate any commercial activity on any tract, and no commercial activity shall be conducted from any lot in this subdivision, unless approved by developer.

(Emphasis added).
It is well established that restrictive covenants are strictly construed. Cashio, 481 So.2d at 1015; Clark v. Manuel, 463 So.2d 1276, 1279 (La.1985). Doubt as to the existence, validity, or extent of building restrictions is resolved in favor of the unrestricted use of the immovable. LA. CIV.CODE ANN. art. 783. Apart from the rule of strict interpretation, documents establishing building restrictions are subject to the general rules of the Louisiana Civil Code governing the interpretation of juridical acts. Id., comment İ; Allen v. Forbess, 345 So.2d 950 (La.App. 2 Cir.1977). According to these general rules, interpretation of a contract is the determination of the common intent of the parties. LA. CIV.CODE ANN. art.2045. The expressed intention of the parties, as contained in the covenant, must be ascertained, according to the words therein, their usual meaning and with due consideration to the entire context of the document. Payne v. Melancon, 34,667 (La.App. 2 Cir. 9/17/01),793 So.2d 1286, 1288. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. LA. CIV.CODE ANN. art.2046. The authority cited above establishes the rule of interpretation that when a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit. LA. CIV.CODE ANN. art.2046, comment (b); Maloney v. Oak Builders, 256 La. 85, 235 So.2d 386 (1970).
Although contained in one numbered paragraph of the building restriction, paragraph 7 contains two separate restrictions. First, the opening sentence addresses house trailers, buses, commercial vehicles or trucks and states they "shall [not] be kept, store[d], repaired, or maintained on any lot, servitude or right-of-way in any manner which would detract from the appearance of the subdivision." Then, the concluding sentence considers a structure of any temporary character, trailer, basement, tent, shack, or other out-building and provides that they "shall [not] be allowed on any tract for a prolonged period of time so as to detract from the appearance of the subdivision, unless approved by *483 developer." Considering the separate topics contained in paragraph 7, it is evident from a clear reading of the provision that it is only the latter provision that the developer may exempt.
No such interpretation is needed for the provision of paragraph 16 of the building restriction. Clearly, with the approval of the developer, a building or structure, as provided in paragraph 16 of the building restrictions, may be used to operate a commercial activity on any tract in this subdivision.
Clearly, the same holding in LeBlanc is applicable here. Whether or not certain property in the Front Lots may be used for commercial purposes as contemplated in paragraph 16 is contingent entirely upon the caprice of William M. King, Jr., his wife, Shirley Martin King, and the two other family members who developed the Front Lots on Fugler Road. Similarly, as provided in the second sentence of paragraph 7, the developer may allow a temporary structure, trailer, basement, tent, shack, or other out-building. Considering the provisions of LA. CIV.CODE ANN. art. 775, these provisions of the building restrictions failed to constitute real rights because they did not foster the development of this property in pursuance of a general plan capable of being preserved. Therefore, these covenants did not run with the land for the benefit of the purchasers or grantees of property in this subdivision.
It cannot be denied that the provisions of Paragraph 1 ("All tracts are hereby designated as residential, and they shall be used for none other than residential purposes,") and the opening sentence of Paragraph 7 ("No house trailers, buses, commercial vehicles or trucks shall be kept, store[d], repaired, or maintained on any lot, servitude or right-of-way in any manner which would detract from the appearance of the subdivision.") conflict with paragraph 16 which clearly gives the developer the right to approve a commercial use of the property. Such a conflict, however, calls into operation the general rules of construction.
Even if the words are fairly explicit, it is our duty to refrain from construing them in such a manner as to lead to absurd consequences. Texaco v. Vermilion Parish School Board, 244 La. 408, 152 So.2d 541 (1963); National Roofing and Siding Co. v. Giaise, 434 So.2d 85 (La.App. 5 Cir.1982), writ denied, 435 So.2d 443 (La.1983). When a literal interpretation will produce absurd consequences, the court may consider all pertinent facts and circumstances, including the parties' own conclusion of the instrument's meaning, rather than adhere to a forced meaning of the terms used. LA. CIV.CODE ANN. art.2046; Kendrick v. Garrene, 233 La. 106, 96 So.2d 58 (1957); Cardos v. Cristadoro, 228 La. 975, 84 So.2d 606 (1955).
Considering the irreconcilable difference created in this building restriction as regards commercial activity and giving recognition to the dictates of LA. CIV.CODE ANN. art. 783 to resolve doubt as to the existence, validity, or extent of building restrictions in favor of the unrestricted use of the immovable, I conclude these building restrictions relative to commercial activity do not constitute a general plan as required in LA. CIV.CODE ANN. art. 775. As provided in paragraph 16, the developer may approve commercial activity on any tract despite the declaration in paragraph 1 that "[a]ll tracts are . . . designated as residential." Thus, I find the plaintiffs may not enforce the provisions of paragraphs 1 and the first sentence of paragraph 7 pertaining to commercial trucks and vehicles, as they do not constitute a real right.
*484 Building restrictions are a means of insuring the lasting aesthetic and monetary value of property. They involve a scheme or plan of which all prospective purchasers are aware. Chambless v. Parker, 38,276 (La.App. 2 Cir. 3/3/04), 867 So.2d 974, 978; 4626 Corp. v. Merriam, 329 So.2d 885 (La. App. 1 Cir.), writ denied, 332 So.2d 800 (La.1976). A cursory reading of the building restrictions in the present case would have alerted any prospective purchaser that the developer reserved the right to approve any of the subdivision lots for commercial use. In this regard, I further find the majority's reliance on Oakbrook Civic Ass'n v. Sonnier, 481 So.2d 1008 (La.1986), misplaced and factually distinguishable. Although this Court approved the use of neighborhood committees to approve certain construction plans in Oakbrook, in the present case the Kings reserved to themselves, in the restrictions, the option of granting a variance for commercial use, which reservation clearly negated a finding of a general plan as required by the pertinent provisions of the civil code. This vastly differs from the procedure approved in Oakbrook.
For the foregoing reasons, I would affirm the court of appeal on other grounds, dismiss the plaintiffs' action based upon the violation of building restrictions, dissolve the preliminary injunction granted in the trial court, and remand the matter to the trial court for consideration of the issues related to the plaintiffs' contention that they are also entitled to damages and the issuance of an injunction grounded on the law of nuisance.
NOTES
[1] The case caption erroneously identifies the defendant as Henry Holcomb.
[2] At no time did the plaintiffs object to the Holcombs' construction of the outbuilding. Similarly, they did not complain about Joyce Holcomb's use of the Front Lot property to park her school bus.
[3] See discussion later in this opinion of when the service and maintenance of these trucks on the property became noticeable.
[4] King further stated that this declaration was effective retroactively to the date the Holcombs purchased their lot on Fugler Road. We recite this fact as a matter that transpired, but decline to comment on the legal efficacy of this ex post facto declaration.
[5] The record contains a stipulation that four of the original plaintiffs, Carrie Fitzgerald, John Fitzgerald, Keith Stevens, and Peter Oelschlaegar, voluntarily withdrew their claims. Wayne Cosby lives in Wedgewood Acres, and the Williams and Stan McDonald live on the Front Lots. The Holcombs contended in the peremptory exception of no right of action that plaintiffs' action was based on a violation of the Wedgewood Acres' restrictions and that because only Wayne Cosby lived in Wedgewood Acres, only he had the right to bring an action based on a violation of the Wedgewood Acres' restrictions. However, the Holcombs argued that because they did not live in Wedgewood Acres, Cosby's claims must be dismissed. The Holcombs further argued that because none of the other plaintiffs lived in Wedgewood Acres, they had no right of action either. Finally, the Holcombs argued that even if the court found the Wedgewood Acres' restrictions applied to the Front Lots, giving Mr. McDonald and the Williams a right of action, then the developer gave them permission to use the property for the trucking business and therefore their claims should be dismissed.

At no time did the Holcombs premise their peremptory exception on whether the applicable building restriction was part of a general plan.
[6] The trial court ruled on the exception of no right of action as follows:

Defendants contend that the only plaintiff that may have a right to sue them is Wayne Cosby because he is the only plaintiff who lives in the subdivision of Wedgewood Acres. According to the testimony, Stan McDonald, Karen Williams and Carl Williams also live in the subdivision as residents of the subdivision. Therefore, they have a right of action to bring a suit under the subdivision restrictions.
Additionally, plaintiffs filed suit under the theory of Louisiana Civil Code Article 667 which reads in part "Although a proprietor may do with his real estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him." Article 667, therefore provides a cause of action to a landowner's "neighbors" and all the plaintiffs in the instant suit are the neighbors of the defendants. Accordingly, the plaintiffs have a right of action to bring this suit against the defendants on more than one legal basis.
[7] Prior to trial of this issue, the parties severed the plaintiffs' nuisance claim from the claims based on the violations of the building restrictions; the nuisance claim is still pending.
[8] The amended judgment for the preliminary injunction provided for the excepted business communications as follows:

The said defendants shall be allowed to conduct communications from their home by telephone, mail, email, and internet to facilitate the business of Holcomb Trucking, Inc. provided such activity is conducted within the confines of the buildings located on said property, and further provided that such conduct does not promote an appearance to third parties that any commercial activity is being conducted from said property.
[9] In Oakbrook, Article VI of the building restrictions provided:

Review by Committee. No building, fence, wall or other structure shall be commenced, erected or maintained upon The Properties, nor shall any exterior addition to or change or alteration therein be made until the plans and specifications showing the nature, kind, shape, height, materials, and location of the same shall have been submitted to and approved in writing as to the harmony of external design and location in relation to surrounding structures and topography by the Board of Directors of the Association, or by an architectural committee composed of three (3) or more representatives appointed by the Board.