954 So.2d 800 (2007)
Susan Renee MUEY, Plaintiff-Appellee,
v.
Berry M. CHANDLER, M.D. and Medical Practice Associates, L.C. D/B/A After Hours Clinic, Defendant-Appellant.
No. 41,942-CA.
Court of Appeal of Louisiana, Second Circuit.
April 4, 2007.
Karl J. Koch, Baton Rouge, for Appellant.
Michael L. Dubos, Monroe, for Appellee.
Before WILLIAMS, STEWART and GASKINS, JJ.
WILLIAMS, J.
Defendant, Berry M. Chandler, M.D., appeals a judgment of the trial court finding him liable to plaintiff, Susan Renee Muey, for offensive, non-consensual touching and awarding $7,500 in damages. For the following reasons, we affirm the trial court's judgment.

FACTS
Defendant operated After Hours Urgent Care Clinic ("the clinic"), a walk-in medical clinic, in West Monroe, Louisiana. Plaintiff's two school-aged sons had been examined by defendant at the clinic on various *801 occasions. In November or December of 2000, plaintiff visited the clinic to request a medical excuse for one of her sons. Defendant led plaintiff to his office where he kissed her and placed her hand on his erect penis without her consent.
On January 30, 2001, plaintiff reported the incident to the police after seeing a news report of defendant being arrested for similar conduct with other female patients. Plaintiff's allegations led to additional criminal charges being filed against defendant.[1]
Plaintiff filed the instant civil suit, alleging the incident with defendant caused her past, present and future pain and suffering, mental anguish, distress, embarrassment and worry. Following a bench trial, the trial court ruled in favor of plaintiff stating:
The Court believes plaintiff made a case in violating trust she placed in him as a member of the health care profession. That he violated her physically by kissing and placing her hand on his erect penis. He also violated her emotionally in that by her own testimony, she has had lack of sleep, lack of concentration, embarrassment, and emotional distress.
The trial court awarded plaintiff $7,500 in damages, plus court costs. This appeal followed.

DISCUSSION
Defendant contends the trial court erred in finding him liable to plaintiff for damages. According to defendant, the trial court based its judgment solely upon plaintiff's testimony, which was not credible, while ignoring evidence submitted by the defense.
In a fact-intensive case, the appellate standard of review is the manifest error/clearly wrong standard. When findings of fact are based on determinations regarding the credibility of witnesses, the manifest error/clearly wrong standard demands great deference to the trier of fact's findings. Rosell v. ESCO, 549 So.2d 840 (La.1989); Crawford v. Ryan's Family Steak Houses, Inc., 31,911 (La.App.2d Cir.5/5/99), 741 So.2d 96; Tanner v. Brookshire Grocery Co., 29,276 (La.App.2d Cir.4/2/97), 691 So.2d 871.
In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Cosby v. Holcomb Trucking, Inc., XXXX-XXXX (La.9/6/06), 942 So.2d 471; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Munro v. Carstensen, 41,714 (La.App.2d Cir.12/20/06), 945 So.2d 961. The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. Id. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Id. However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly *802 based upon a credibility determination. Rosell, supra. But where such factors are not present, and a fact finder's finding is based on its decision to credit the testimony of one or two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Id.
In the instant case, plaintiff testified that she entered the clinic and explained the reason for her visit to the receptionist. While she was speaking to the receptionist, defendant exited an examination room and advised plaintiff that he would need to speak to her privately before providing her with the medical excuse for her son. Plaintiff waited in the waiting area until defendant called her to his office. Once plaintiff and defendant entered his office, defendant closed the door and told her he had been attracted to her for some time and wanted to get to know her more intimately. Plaintiff informed defendant that she was married, and defendant responded, "So am I. Nobody has to know." Defendant then asked her if she could come back to the clinic later so they could "work something out." Defendant informed her that he had a bed in one of the back rooms because he lived at the clinic. When plaintiff asked once more for the medical excuse, defendant grabbed her and kissed her. Plaintiff pushed defendant away, and he grabbed her arm and placed her hand on his erect penis, stating, "See what you do to me." Plaintiff pulled free from defendant's grasp and fled the premises.
Plaintiff's friend, Kristen Coon, testified that plaintiff called her from her cellular phone soon after she left defendant's office. Plaintiff was crying and "very upset" and could not speak coherently. Once she was able to speak, plaintiff told Ms. Coon that she had just left defendant's office and defendant had "grabbed her and kissed her and put her hand on his genitals."
Judy London, defendant's former nurse, also testified during the trial. Ms. London stated that on a prior occasion, defendant had asked her whether plaintiff was married and, if so, "if she messed around."
Amy Day, one of the women who initiated criminal charges against defendant, also testified during the trial. She stated that she visited defendant's clinic in September or October of 2000 for treatment of an ear infection. She stated that defendant began to make "flirtatious" comments, which she ignored. While listening to her heart with a stethoscope, defendant placed his hand inside of her bra and told her to unhook her bra so he could examine a rash on her neck and upper chest area. When she complied, defendant fondled her breasts. She allowed defendant to administer an injection in her hip, and he positioned her on a stool and positioned himself behind her, stating, "That looks good." Ms. Day pulled her pants down to receive the injection, but defendant told her it was necessary to pull her pants down further than her hip area. He attempted to pull her pants further down, but she kept pulling them back up. After receiving the injection, Ms. Day left the examination room, and defendant followed her to her vehicle telling her in a flirtatious manner, "Come back and see me."
Defendant testified that plaintiff visited his medical clinic on the day in question to receive a false medical excuse because her son was in danger of failing one of his classes due to excessive tardiness. Defendant corroborated plaintiff's testimony that their initial conversation took place in the waiting area of the clinic. However, defendant denied inviting plaintiff to his office. He testified that when he proceeded to his office to review her son's medical records, plaintiff followed him uninvited. *803 After reviewing the chart, defendant realized the child had not visited the clinic in several months. When he told plaintiff it was improper to give false medical excuses, plaintiff leaned over toward him in a "coy" and "flirtatious" manner. When he ignored her attempt to flirt with him, plaintiff became angry and demanded the excuse. He told her, "Get the hell out of the office and do a better job of raising your kid." Plaintiff angrily left the clinic.
Defendant denied telling plaintiff he was attracted to her and he denied grabbing her or kissing her. Defendant also denied asking Ms. London about plaintiff's marital status and whether plaintiff "messed around." Defendant further denied behaving inappropriately with Ms. Day. On cross-examination, defendant admitted that in the initial encounter with plaintiff in the waiting area of the clinic, he asked plaintiff whether or not she had inquired about him at a party.
Kevin Albritton testified that he and his son were at the clinic on the day in question. Mr. Albritton stated that he heard "loud talking" and a door slamming, and soon thereafter, defendant entered the examination room where he and his son were waiting. Defendant told Mr. Albritton that he was "kind of shook up" because one of his female patients had requested a two-week medical excuse for her son. Defendant described the request as "outrageous" and told Mr. Albritton that the woman was dissatisfied when he refused to comply with her request. On cross-examination, Mr. Albritton admitted that he did not see the person defendant had been talking to and did not hear the contents of the conversation between defendant and the other person.
In an effort to bring plaintiff's credibility into question, defendant introduced plaintiff's medical records into evidence and cross-examined her with regard to the contents of the records. Plaintiff admitted that she was hospitalized in the psychiatric unit at North Monroe Hospital on June 28-29, 2001 for anxiety and depression. She informed the hospital staff that her symptoms were associated with marital conflicts, and she did not mention the incident with defendant to health care professionals during her hospitalization. Plaintiff testified that the incident with defendant "compounded" her marital difficulties.
Plaintiff was also hospitalized in the psychiatric unit at Gulf Coast Medical Center in Biloxi, Mississippi on July 4-5, 2001 following a suicide attempt. She told the hospital personnel that she took "some pills" after an argument with her husband because she was "tired of being manipulated" by her husband. Plaintiff did not mention the incident with defendant during her hospitalization. She testified that she did not want "everyone in the world" to know about the incident.
Defendant also introduced into evidence records from Dr. J. Dean Stockstill, plaintiff's primary care physician. Dr. Stockstill had previously prescribed plaintiff medication for depression and anxiety. After her discharge from the hospital in Biloxi, plaintiff was examined by Dr. Stockstill, and she did not mention the suicide attempt to him. During her testimony at trial, plaintiff stated she did not mention the suicide attempt to Dr. Stockstill because there was "no point in bringing it up."
Defendant also submitted the transcript of plaintiff's testimony during the preliminary examination in defendant's criminal proceedings, pointing out that during her testimony, plaintiff did not mention her suicide attempt; nor did she mention any prior molestation and/or abuse by family members. However, the transcript reveals that plaintiff was not questioned *804 about the suicide attempt or prior incidents of molestation and/or sexual assault during the preliminary examination.
Defendant further cross-examined plaintiff with regard to past incidents of "bizarre conduct." Soon before her psychiatric hospitalization at North Monroe Hospital, plaintiff became angry with her husband and used a brick to break the windows of a bar she and her husband owned. Plaintiff also threw a beverage at her husband's business partner and had his car towed away. Ken Schlessman, a former Ouachita Parish Sheriff's Deputy, testified that on April 8, 1997, plaintiff reported that a member of a work crew working at her house had attempted to crawl through her window. No arrest was made because there was no evidence that the worker had actually gained entry into the house.
After hearing all of the evidence and observing the demeanor of the witnesses, the trial court concluded that the offensive touching took place. We have reviewed the record and testimony and could find no indication the trial court was clearly wrong. Plaintiff testified defendant grabbed her, kissed her and placed her hand on his penis without her consent. Defendant denied the allegations, and there were no other witnesses to the incident. It is clear from the judgment and the reasons therefor that the trial court found plaintiff's testimony to be credible. For these reasons, we find the trial court's determination that defendant touched plaintiff in an offensive manner was reasonable and will not be disturbed by this court.

CONCLUSION
For the reasons set forth above, the trial court's judgment is hereby affirmed. Costs of this appeal are assessed to defendant, Berry M. Chandler, M.D.
AFFIRMED.
NOTES
[1] After the criminal trial ended in a mistrial, defendant entered a best interest plea, pursuant to North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). Defendant pled guilty to four counts of misdemeanor battery and one count of misdemeanor possession of a controlled substance. He was sentenced to probation and was required to surrender his license to practice medicine.