STEPHEN J. WINDHORST, Judge.
[^Defendant, East Jefferson General Hospital (“EJGH”), appeals from a ruling of the trial court finding it liable for inju *1256 ries sustained as a result of a “slip and fall” type accident on its property. For the reasons that follow, we affirm the decision of the trial court.
Plaintiff Karen White[1] was employed by Nurse First, LLC as an agency nurse and was assigned to work at Select Specialty Hospital (“SSH”)[2] on March 17, 2007. SSH leased property from EJGH, specifically the 5th floor of its hospital building. On March 17th, Ms. White sustained injury when she slipped, on two separate occasions, on water on the floor in Room 9501. Ms. White filed suit against SSH and EJGH. Thereafter, worker’s compensation carrier, Commerce & Industry Insurance Company, filed a petition for intervention.
13After a bench trial on the merits, the court found in favor of Ms. White and against EJGH as follows: medical expenses of $246,921.70; lost wages of $198,000.00; and general damages of $150,000.00. The awards were subject to assessments of comparative fault. EJGH was found to be 50% at fault, SSH was found to be 30% at fault, and Ms. White was found to be 20% at fault. The awards were further subject to payment in favor of the worker’s compensation intervenor of $230,795.25. EJGH now appeals from this finding of the trial court.
Karen White testified at trial that during 2007 she was employed by Nurse First, LLC and also Advantage. On March 17, 2007, she was assigned to Select Specialty Hospital, located on the fifth floor of East Jefferson General Hospital. She was working a 7:00 p.m. to 7:00 a.m. shift. At approximately 7:40 p.m., when she was first making her rounds, she went into Room 9501. Room 9501 was a double occupancy room and housed two patients, one of whom was under Ms. White’s care. Ms. White spoke to the first occupant, and then, when she turned to proceed to her patient, she slipped in some clear water on the floor. Her body twisted, but she caught herself and did not fall. When she slipped, she heard a loud pop in her right hip, causing injury to her hip and lower back. She also injured her shoulder when she caught the door handle to prevent herself from falling. She looked up to the ceiling and noticed that one ceiling tile was missing. She then went to the charge nurse on duty to notify him about the water on the floor and the missing ceiling tile. Ms. White testified that she did not see the water before she slipped and that there were no “wet floor” signs posted outside of the room. She further testified that the water was clear, and had no material in it. Because of the low lighting in the room, she did not see the water before she slipped in it.
Ms. White testified that she “limped” down the hall to inform the charge nurse. The charge nurse, Terrance Donnels, told her he should have put the “wet |4floor” sign down. Ms. White put the “wet floor” sign up and she and Mr. Donnels placed a blanket over the entire puddle of water. Ms. White also reported her accident to Nurse First, and asked them to send a replacement; however no one was available at that time.
Approximately 15 minutes later, Ms. White went back into Room 9501 to assess her patient. She then realized that she had forgotten her gloves and she pivoted *1257 to retrieve them. When she did, she slipped in a different puddle of clear water. She had to step over the blanket to get to where she was when she slipped. Again, she was able to catch herself before she fell, however she hurt her neck. She informed Mr. Donnels, who agreed to redistribute her patients so that she could leave after administering the 11:00 p.m. medications. Ms. White left the hospital at 12:00 a.m., after filling out an accident report.
Ms. White testified that she did not see anyone from EJGH maintenance or EJGH housekeeping at any time from her arrival at 6:45 p.m. to her departure at 12:00 a.m. She also testified that at the time of her second “slip”, she saw the missing ceiling tile pushed between the bathroom door and the wall in the room.
Mr. Kenneth Najolia, employed by EJGH, was the maintenance mechanic on duty at the time of the accident. He investigated the leak in the ceiling in Room 9501 on the date of the accident. He stated that he was called on two separate occasions that night and discovered at both times that the leaks into Room 9501 were caused by a stopped toilet, which had been stopped twice, in the room above. He stated that his shift that evening was from 2:30 p.m. until 11:00 p.m. One call occurred during the first half of his shift, and one occurred during the second half, although he was not sure of the exact times. During the first call, he observed a drip from the ceiling, and he pushed the ceiling tile up and over inside the ceiling. He observed water leaking from a toilet hub in the room on the 6th floor above, |sRoom 6639. When he went upstairs, he found water on the bathroom floor, and spilling over the toilet lid. The water was clear, with no material. He removed paper towels from the toilet, and then checked to make sure there was no further blockage. He informed the 6th floor charge nurse that there was water on the floor and to call housekeeping. He went down to the 5th floor, told the charge nurse on duty that there was water on the floor that had come from the 6th floor and to call housekeeping. He also told the 6th floor charge nurse to keep a watch because it might happen again. Mr. Najolia stated that he did not clean the water himself, nor did he post a “wet floor” sign, as these were not part of his duties as maintenance mechanic. He did not check to see if the water in Room 9501 had been cleaned up. He also did not replace the ceiling tile, but left it inside the ceiling to the side.
About an hour and a half later, Mr. Najolia received a second call about a leak from the 6th floor. He went back to Room 6639, and saw the same problem with the room, except that the water was deeper. He pulled out a second set of paper towels and then flushed to make sure the toilet was working properly. He next alerted, first, the 6th floor charge nurse and then the 5th floor charge nurse. Again, he did not clean the water or post a “wet floor” sign, nor did he return to see if the water had been cleaned.
At the trial, Mr. Najolia testified that the condition of the towels and conversation that he overheard on his first visit to Room 6639 led him to believe that the towels had been intentionally placed in the toilet, and that there was a possibility that it might happen again, which was why he told the 6th floor charge nurse to keep watch. Mr. Najolia stated that he filled out only one work form, designated an MP2. He did not write any comments on the form.
The deposition of Terrance Donnels was admitted at trial. He testified that he was *1258 employed by SSH and was the charge nurse on duty on the date of 16Ms. White’s accident. He testified that on the night of the accident, he was notified that there was some wet debris on the floor in Room 9501. He did not immediately cover the water or place a “wet floor” sign, instead he went to call maintenance. Within minutes he was alerted that Ms. White had an accident. Mr. Donnels was the only person to testify that Room 9501 had a recurring problem with wet ceiling tiles and this assertion was not borne out by the maintenance repair orders introduced into evidence. Mr. Donnels testified that the water on the floor that caused Ms. White’s accident was a two foot by one foot rectangle that contained soaked gypsum debris, although both Ms. White and Mr. Najolia testified that the water was clear. After Ms. White’s accident, Mr. Donnels put a blanket on the debris pile. He stated that he was informed of the leak between 8:00 p.m. and 9:00 p.m. and that the accident occurred about five minutes later. He spoke to Ms. White, who told him that she had slipped, but had not fallen, and that she felt pain in her lower back and hip. He then went and put out a “wet floor” sign and covered the water with a blanket. He did not recall Ms. White complaining of a second slip that night.
The deposition testimony of Robert Baker was admitted at trial. He testified that on the date of Ms. White’s accident, he was employed by SSH as both a respiratory manager and a safety officer. As a safety officer, his duties were to make sure that the environment of the unit was up to OSHA standards and DHH code, and included making sure that there were no hazards around the unit, that there were no penetrations in the walls (a fire hazard), that equipment was stored properly, and that the hallways were clear. He was also responsible for communicating with EJGH concerning safety issues. He stated that everyone was appointed to observe hazards and make sure their areas were safe, especially people in leadership positions such as charge nurses and lead therapists. In 17addition, nurses had a duty to inspect their areas and report hazardous conditions to the charge nurses.
The next day, after he received notification that someone had been hurt, Mr. Baker inspected Room 5901. He noted that one ceiling tile was missing, but that there was no hazard remaining. The ceiling tile was replaced; however to his knowledge, no other work was performed.
Mr. Roland Jordan testified that, on the date of Ms. White’s accident, he was employed by EJGH as a maintenance supervisor and that Mr. Najolia was one of eighteen people he supervised. Mr. Jordan testified that the MP2 system is a work order system to track different records of work performed by his personnel in the hospital. Mr. Jordan testified that Mr. Najolia followed proper procedure in going to the 6th floor to find the leak rather than staying in Room 9501 to warn people. It would not be unusual for there to be one MP2 for the two separate incidents. Mr. Jordan identified the MP2 sheets for Room 9501 from 2004 to 2007. The MP2 entitled “Work Order No. 0000128574” noted a water leak from Room 6639 on March 17, 2007, although the report was not closed until April 30, 2007.
After the accident, Ms. White was treated by Dr. John Clark, specializing in physical medicine and rehabilitation, who diagnosed a “pelvic floor injury” (an injury involving the ligaments of the pelvis). She was told that the only treatment was conservative, and the injury would be some *1259 thing she would have to live with the rest of her life. She was also seen by Dr. Kenneth Vogel, a neurosurgeon, who believed she had some spinal issues. He recommended that she undergo testing and possible surgery. In November of 2008, Ms. White went to the Laser Spine Institute, in Tampa, Florida, where she was diagnosed with a herniated disc, facet arthrosis and hypoesthesia. She underwent two minimally invasive surgeries, one on her neck and one on her back. Ms. White testified that these surgeries afforded [¡^significant, but not total, relief from pain. At the time of trial, Ms. White was still seeing Dr. Clark for treatment.
Ms. White was also treated by Dr. Marc Zimmerman, a medical psychologist. He diagnosed depression secondary to her physical condition.
Ms. White testified that she was no longer able to perform her duties as a floor nurse. She was planning to attend school to obtain her master’s degree in nursing education in order to become an instructor.
In this appeal, EJGH alleges that the trial court erred in finding liability because the evidence fails to show that either EJGH or its employee Najolia had actual or constructive knowledge of the particular puddles involved in Ms. White’s two slips. EJGH further contends that the evidence fails to show that Najolia and EJGH had a reasonable opportunity to remedy the particular puddles but failed to do so. Finally, EJGH contends that the trial court erred in its allocation of fault.
Appellate courts review factual findings utilizing the manifestly erroneous/clearly wrong standard of review. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). “In order to reverse a fact finder’s determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous.” Buckheister v. U.S. Envtl. Services, L.L.C., 11-1148 (La.App. 5 Cir. 5/31/12), 97 So.3d 414, 420, writ denied, 12-1462 (La.10/8/12), 98 So.3d 861. One of the basic tenets of the manifest error standard of review is that “reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the court of appeal is convinced that had it been the trier of fact, it would have weighed the evidence differently.” Savage v. State Farm Mut. Ins. Co., 09-852 (La.App. 5 Cir. 2/9/10), 33 So.3d 919, 922, citing Rando v. Anco Insulations Inc., 08-1163 (La.5/22/09), 16 So.3d 1065, 1087.
“However, where documents or objective evidence so contradict the witness’s story, the court of appeal may find manifest error or clear wrongness (sic) even in a finding purportedly based on a credibility determination.” Cosby v. Holcomb Trucking, Inc., 05-0470, pp. 12-13 (La.9/6/06), 942 So.2d 471, 479. “[Wfcere such factors are not present, and a fact finder’s finding is based on its decision to credit the testimony of one or two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.” Id.
EJGH first alleges that the trial court erred in finding that it or its employee had actual or constructive knowledge of the hazardous conditions in Room 9501 and/or that it had a reasonable opportunity to correct the hazardous condition and failed to do so.
La. R.S. 9:2800 provides, in pertinent part:
*1260 A. A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody.
[[Image here]]
C. Except as provided for in Subsections A and B of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
D. Constructive notice shall mean the existence of facts which infer actual knowledge.
* * ⅜
G. (1) “Public entity” means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, employees, and political | ^subdivisions and the departments, offices, agencies, boards, commissions, in-strumentalities, officers, officials, and employees of such political subdivisions. Public entity also includes housing authorities, as defined in R.S. 40:384(15), and their commissioners and other officers and employees and sewerage and water boards and their employees, servants, agents, or subcontractors.
La. R.S. 9:2800 applies to EJGH pursuant to paragraphs (A) and (G)(1) of the statute. Hoffman v. Jefferson Parish Hosp. Services Dist. No. 2, 11-776 (La.App. 5 Cir. 4/10/12), 87 So.3d 370, 374, writ denied sub nom., Hoffman v. Jefferson Parish Hospitals Services Dist. No. 2, 12-1295 (La.9/28/12), 98 So.3d 842.
The legal analysis for injury as a result of an alleged defective condition against a public entity such as EJGH is the same whether the cause of action is raised under La. C.C. art. 2317 and La. R.S. 9:2800 strict liability, or in negligence pursuant to La. C.C. art. 2315.2. The plaintiff bears the burden of showing that: (1) the public entity had custody of the thing that caused the plaintiffs injuries or damages; (2) the thing was defective because it had a condition that created an unreasonable risk of harm; (3) the public entity had actual or constructive knowledge of the defect and did not take corrective measures within a reasonable time; and (4) the defect in the thing was a cause-in-fact of the plaintiffs injuries. To recover, a plaintiff bears the burden of proving all of these inquiries in the affirmative and failure on any one is fatal to the case. Graff v. Jefferson Parish Hosp. Serv. Dist. No. 2, 09-598 (La.App. 5 Cir. 3/23/10), 39 So.3d 685, 690-91, unit denied, 10-0907 (La.6/18/10), 38 So.3d 331.
In order to maintain a claim for damages caused by the condition of things within the care and custody of a public entity, the complainant has the burden of proving that the public body had actual or constructive notice of the hazard and had a reasonable opportunity to remedy the condition, but failed to do so. La. R.S. 9:2800(B). Constructive notice is defined as “the existence of facts which infer factual knowledge.” La. R.S. 9:2800(C). Constructive notice can be found if the conditions which caused the injury existed for such a period of time that those responsible, by the exercise of ordinary care and diligence, must have known of their existence in general *1261 and could have guarded the public from injury. Maldonado v. Louisiana Superdome Comm’n, 95-2490 (La.App. 4 Cir. 1/22/97), 687 So.2d 1087, writ denied, 97-0469 (La.4/18/97), 692 So.2d 448. The plaintiff bears the burden at trial of proving actual or constructive notice. Bridges v. FCS Entertainment, 00-1041 (La.App. 4 Cir. 5/23/01), 789 So.2d 691.
Blount v. E. Jefferson Gen. Hosp., 04-407 (La.App. 5 Cir. 10/12/04), 887 So.2d 535, 537-38.
In its oral reasons for judgment, the trial court stated that Ms. White proved, by a preponderance of the evidence, that she suffered injury and corresponding damage “as a result of the negligence displayed in this case.” Given the evidence presented, the trial court could have found that prior to Ms. White reporting for duty on the date of the accident, the toilet in the room directly above Room 9501 overflowed, causing flooding and that some of the water eventually made its way down to Room 9510, creating a puddle on the floor. Mr. Najolia, an employee of EJGH, admitted that he knew of the water on both the 5th and the 6th floors; but, he did not clean the water up himself. He stated that he informed the 5th floor charge nurse of the need to call EJGH’s housekeeping; however, nothing was introduced at trial to indicate that housekeeping ever responded. A second overflow occurred sometime later, and Mr. Najolia again unplugged the toilet. Again, he did not clean the water on the 5th or 6th floor, and again he testified that he told the charge nurse; however, he did not follow up to see if the water had been removed, and again there was no evidence introduced to show that housekeeping responded. Thus, we find no manifest error in the trial court’s determination that EJGH knew or should have known of the defective | ^condition (the water on the floor in Room 9501) and could have guarded Ms. White from injury, but failed to do so.
EJGH next alleges that the trial court erred in its apportionment of fault.
Pursuant to Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985), the trier of fact should compare the relative fault of the parties in the assessment of liability. In assessing comparative fault, the following factors should be considered: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson, supra. The trier of fact’s allocation of fault is a factual determination subject to the manifest error rule. Priest v. City of Bastrop, 34,841 (La.App. 2 Cir. 7/11/01), 792 So.2d 80, 84.
In this case, the trial court assessed 50% fault to EJGH, 30% to SSH and 20% to Ms. White. We find no manifest error in this determination. EJGH was aware of the condition and failed to take steps to remediate. SSH also had responsibility to its workers and patients to remediate. Finally, Ms. White bears some liability for her actions in stepping over the blanket which covered the puddle, since at that time she knew that the hazardous condition still existed.
For the above discussed reasons, the judgment of the trial court is affirmed. Costs are assessed against EJGH, appellant.
AFFIRMED

. Plaintiff's husband, Christopher White, was also a plaintiff, asserting a loss of consortium claim. His claim was voluntarily dismissed with prejudice prior to the trial of this suit.

. Ms. White settled her suit with SSH prior to trial.