GAIDRY, J.
 

 [2A municipality that purchased a lot in a subdivision subject to building restrictions appeals a judgment in favor of a homeowners association, issuing a permanent injunction against the municipality. The homeowners association has answered the appeal, seeking delinquent assessments and additional attorney fees. For the following reasons, we amend the trial court’s judgment and affirm it as amended. We also grant the answer to the appeal in part and deny it in part.
 

 FACTUAL AND PROCEDURAL BACKGROUND
 

 The City of Mandeville (the City) is an incorporated municipality of St. Tammany Parish. The Golden Glen Subdivision (Golden Glen) is located just within the City’s corporate limits, bounded by the Fern Creek Subdivision (Fern Creek) just outside the corporate limits.
 

 Fern Creek was developed by Friends Development, L.L.C. in 1995, and consisted of twelve lots. The developer established building restrictions in a document entitled “Covenant, Deed Restrictions and Obligations” and dated December 29, 1995. By the same document, the developer declared the creation of the Fern Creek Owners Association (the Association), a nonprofit corporation to consist of all owners of property in Fern Creek. The document establishing the building restrictions was filed in the conveyance records of St. Tammany Parish on February 16, 1996, after eleven of the twelve lots had already been sold.
 

 
 *373
 
 Lot 12 in Fern Creek is bounded on its south side by lots 57 through 63 in Golden Glen, and by Chinchuba Bayou (or Creek) on a portion of its northwest side. Although a small portion of the lot includes wetlands, the majority of the lot does not. A portion of what became Lot 12 in Fern Creek was originally reserved by the developer for possible sale to the owners of |sfour adjacent lots in Golden Glen (Lots 60 through 63), but no sales were made. Lot 12 was first acquired by David Scalfano, one of the principals of Friends Development, L.L.C., and his wife, Kathyrn Scalfa-no. In 2000 or 2001, Mr. Scalfano erected a six-foot wood privacy fence across a portion of Lot 12’s boundary with Golden Glen.
 

 On July 15, 2000, the owners of all twelve lots executed a document expressly adopting and accepting the building restrictions established by the developer, and ratifying the developer’s actions in that regard.
 
 [1]
 

 On July 10, 2002, the Scalfanos sold Lot 12, which was still vacant, to Kevin and Kimberly Vanderbrook. On September 3, 2002, Mr. Vanderbrook wrote to the Association’s Architectural Control Committee, requesting its approval to make “minor improvements,” including the construction of a wood “privacy fence,” six feet in height, along the front left (south) portion of his property. His expressed intent was to “continue the existing privacy fence” along a portion of the property line and to “screen out the back of homes in Golden Glen and prevent foot traffic from these homes.” An elevation diagram of the proposed privacy fence included the statement that it was “to match [the] existing fence.” Approval was also requested for a different “estate type” of fence along the left rear property line. A plat, indicating the locations of the proposed fences in relation to the locations of the existing sections of fence, was also included with the letter. On September 25, 2002, Diane Huffman replied on behalf of the Association, advising Mr. Vanderbrook of the Committee’s approval “for a wood fence along your property line common with Golden Glen.” However, the proposed fence was never constructed by the Vanderbrooks.
 

 |,[On July 17, 2004, certain residents of Kimberly Drive in Golden Glen sent a letter to the City’s mayor, advising of their joint opposition to the establishment of a servitude on their properties, and expressing their refusal to allow their properties to be used for emergency egress in the event of flooding. They emphasized that the wetlands portion of Lot 12 “plays an important role in minimizing the local flooding by providing valuable storm water drainage[,]” and that Lot 12 “directly abuts the bayou.” They further requested that the City purchase Lot 12 “at fair market value,” expressing their belief that “[i]t [was] imperative that the City of Mandeville have exclusive control over the entire property” in order to allow “unobstructed access” for emergency services and “an unobstructed emergency exit route” for Kimberly Drive residents “during high water.” They emphasized that the City “needed to protect the current tax payers
 
 [sic
 
 ] on Kimberly Drive” and should therefore purchase Lot 12 “for the benefit of the residents of Golden Glen.”
 

 Sometime in the summer of 2004, the Vanderbrooks hired a contractor to install a gravel driveway and a culvert on Lot 12. On August 8, 2004, the Architectural Control Committee wrote to the Vander-brooks, advising them that the driveway, culvert, and a wire fence placed on Lot 12
 
 *374
 
 were not in compliance with the building restrictions. It advised the Vanderbrooks that if they did not submit “acceptable plans” relating to the driveway and culvert by August 30, 2004, “the driveway, culvert, and roadway material must be removed.”
 

 After attempting to negotiate a drainage plan with the Vanderbrooks allowing it access to Lot 12, the City at one point proposed expropriation of |fiLot 12, but took no further action toward that end.
 
 [2]
 
 Instead, it initiated overtures to the Van-derbrooks for the purchase of Lot 12 by the City. Learning of the potential sale, Association members met with Mr. Price for the purposes of ascertaining the City’s intent and voicing their concerns about use of the property. The City Council eventually adopted an ordinance on September 23, 2004, authorizing the mayor to negotiate and execute documents for the purchase of Lot 12. The preamble to the ordinance expressed the City’s intent in acquiring the lot in these terms: “[t]he City ... is desirous of obtaining ownership of Lot 12, Fern Creek Estates, City of Mandeville [sic ], ... due to the importance of the said lot for drainage purposes[.]” The ordinance was approved by the mayor on September 27, 2004.
 

 On October 4, 2004, Ms. Huffman, as president of the Association, wrote to the Vanderbrooks, sending a copy to the City, advising them that the Association had been notified of the proposed sale of Lot 12, and reiterated the notice of noncompliance with the building restrictions described in the Architectural Control Committee’s letter of August 8, 2004. The Vanderbrooks and the City were advised that if “acceptable plans” were not submitted by November 1, 2004, the driveway, culvert, and roadway material would have to be removed, and if not so removed, the Association would undertake to do so as authorized by the building restrictions.
 

 On October 14, 2004, the City purchased Lot 12 from the Vanderbrooks. According to the act of sale, the sale was subject to “[t]he restrictions [,] covenants, and setbacks, contained in [the] subdivision plan.” By January of 2005, the privacy fence erected by Mr. Scalfano had been | (¡disassembled, with piles of wooden fencing stacked in piles and fenceposts with attached cement lying along the property line between Lot 12 and Golden Glen.
 

 On April 13, 2005, the Association, Ms. Huffman, and her husband, Kenneth Huffman, filed a petition against the City, seeking injunctive relief, damages, and attorney fees. It was alleged that shortly before the City’s purchase of Lot 12, its predecessor in title (the Vanderbrooks) performed certain acts in violation of the building restrictions, including building a “road” and installing a culvert without pri- or approval from the Association’s Architectural Control Committee.
 

 In its answer, the City admitted its ownership of Lot 12, but alleged that it could not be in violation of any building restriction “as it did not own the property when the alleged violations occurred” and the violations were performed by a third party. The City further alleged that the building restrictions were inapplicable by reason of the public use intended by the City, and that the public use was not in violation of the restrictions.
 

 On January 3, 2007, the Association filed a supplemental and amending petition with leave of court.
 
 [3]
 
 In addition to its prior
 
 *375
 
 allegations regarding the violations existing at the time of the City’s purchase, it alleged that the City had committed or permitted additional violations of the building restrictions, including removal of the existing privacy fence, permitting use of Lot 12 by Golden Glen residents for parking and storage, |7failure to pay dues and assessments, and permitting Golden Glen residents to dump debris. In addition to injunctive relief and damages, the Association also sought declaratory judgment that the building restrictions were applicable to Lot 12 and enforceable against the City, despite its status as a public body or political subdivision. The City reiterated its general denial of liability, alleging that any violations of the building restrictions were attributable only to the prior owners.
 

 On January 31, 2007, the Association filed a motion for partial summary judgment, seeking a summary declaratory judgment on the issue of the applicability of the building restrictions to Lot 12 and to the City as owner. The City did not oppose the granting of judgment as prayed for by the Association. The trial court signed the partial summary judgment on July 11, 2007, declaring that the building restrictions, including the addendum, were applicable to Lot 12 and the City as its owner.
 

 Trial on the merits was conducted on April 28, 2008. In its judgment, the trial court granted the following injunctive relief, in addition to the award of $5,000.00 in attorney fees to the Association:
 

 1.The City ..., its agents, employees and all other persons, firms or corporations acting or claiming to act on its behalf, are permanently enjoined from continuing to allow any violations of the restrictive covenants ..., and any violation of these restrictive covenants brought to the Court’s attention will result in the Court assessing an appropriate fine against the City ... for such violation.
 

 2. The City ... is ordered to timely pay the homeowner’s dues each quarter as billed by the Homeowner’s [sic ] Association.
 

 3. The City ... is ordered to maintain Lot 12 ... as a residential parcel as required by the restrictive covenants referred to herein;
 

 4. The City ... is ordered to remove from Lot 12 ..., and prevent the presence of, all equipment and machinery of any kind other than as allowed by the restrictive covenants.
 

 |s5. The City ... is ordered to remove all debris and/or trash from Lot 12 ... within thirty (30) days of this judgment;
 

 6. The City ... is ordered to rebuild the 6 foot privacy fence on the boundary line of Lot 12 ... with Golden Glen ... as it existed on the date of the acquisition of Lot 12 ... by the City....
 

 7. The City ... is ordered to remove the drainage pipe facilitating drainage from Golden Glen ... onto Fern Creek or, in the alternative, bury a culvert allowing the waste to flow into an appropriate drainage system for said drainage, all within 45 days of this judgment.
 

 8. The City ... is further ordered that
 
 [sic
 
 ] it may not use nor allow any
 
 *376
 
 one else to use Lot 12 ... as a parking lot, landfill, storage for debris of any kind, moving equipment or machinery or any other use that is not allowed by the [building restrictions] ...[.]
 

 The City has appealed devolutively, and the Association has answered the appeal.
 

 ASSIGNMENTS OF ERROR
 

 We summarize the City’s assignments of error on the part of the trial court as follows:
 

 1. The trial court erred in finding that the City violated any building restrictions (or restrictive covenants) and wrongfully enjoined any continuing violation.
 

 2. The trial court’s judgment is vague and enjoins activities that do not violate the building restrictions.
 

 3. The trial court erred in finding that the City used Lot 12 other than as resi-dentially-zoned property.
 

 4. The trial court erred in enjoining the presence of any equipment and machinery of any kind other than as allowed by the building restrictions as such a condition or activity is not prohibited by the restrictive covenants.
 

 lfl5. The trial court erred in ordering the City to reconstruct the six-foot privacy fence between Lot 12 and Golden Glen, as the evidence did not establish its prior existence or location and the restrictive covenants do not require that it be rebuilt.
 

 6. The trial court erred in finding that the drainage pipe violated any building restriction and in ordering its removal.
 

 7. The trial court erred in finding that the City stored any debris on Lot 12.
 

 8. The trial court erred in finding that the Fern Creek Architectural Control Committee had any authority to approve the removal (as opposed to the erection) of a fence.
 

 9.The trial court erred in awarding attorney fees, as there was no showing of a violation of a building restriction.
 

 In its answer to the appeal, the Association contends that the trial court erred in failing to award it the unpaid homeowners association dues (quarterly assessments) and in failing to award it the full amount of attorney fees and costs incurred by the Association. Finally, the Association seeks an additional award of attorney fees incurred in connection with the City’s appeal.
 

 STANDARD OF REVIEW
 

 The issuance of a permanent injunction takes place only after a trial on the merits, in which the burden of proof must be founded on a preponderance of the evidence.
 
 State Mach. & Equip. Sales, Inc. v. Iberville Parish Council,
 
 05-2240, p. 4 (La.App. 1st Cir.12/28/06), 952 So.2d 77, 81. Thus, the standard of review for the issuance of a permanent injunction is the manifest error standard.
 
 Mary Moe, L.L.C. v. La. Bd. of Ethics,
 
 03-2220, p. 9 (La.4/14/04), 875 So.2d 22, 29.
 

 | min order to reverse a factual determination by the trier of fact, the appellate court must apply a two-part test: (1) the appellate court must find that a reasonable factual basis does not exist in the record for the finding; and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
 
 Stobart v. State through Dep’t. of Transp. & Dev.,
 
 617 So.2d 880, 882 (La. 1993). If the findings are reasonable in light of the record reviewed in its entirety, this court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.
 
 Rosell v. ESCO,
 
 549 So.2d 840, 844 (La.1989). Thus, where
 
 *377
 
 there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong.
 
 Stobart,
 
 617 So.2d at 883.
 

 DISCUSSION
 

 Building restrictions, or “restrictive covenants” as they are generally known in the common law and occasionally termed in Louisiana, are charges imposed by the owner of an immovable in pursuance of a general plan governing building standards, specified uses, and improvements. La. C.C. art. 775. They may impose on owners of immovables affirmative duties that are reasonable and necessary for the maintenance of the general plan. La. C.C. art. 778.
 

 Building restrictions generally fall into two classes: (1) true “building” restrictions, which limit the type and size of structures, and (2) “use” restrictions, which limit the uses which may be made of the immovable and its structures.
 
 See Smith v. DeVincent,
 
 322 So.2d 257, 261 (La.App. 2nd Cir.1975). A use restriction may merely involve restraints on the type of use of an immovable, without necessarily imposing restrictions | non the type or size of building on the property.
 
 See
 
 La. C.C. art. 775, Revision Comments — 1977, (b).
 

 Building restrictions may be established only by juridical act executed by the owner of an immovable or by all the owners of the affected immovables. La. C.C. art. 776. An acquirer of immovable property burdened with recorded building restrictions is presumed to have notice of them. La. C.C. art. 776, Revision Comments— 1977, (c).
 

 Building restrictions constitute real rights running with the land, and the remedy of landowners seeking to prevent a violation of the restrictions by another is by injunction.
 
 Cosby v. Holcomb Trucking, Inc.,
 
 05-0470, pp. 6-7 (La.9/6/06), 942 So.2d 471, 475 (quoting
 
 Oakbrook Civic Ass’n, Inc. v. Sonnier,
 
 481 So.2d 1008, 1010 (La.1986));
 
 see also
 
 La. C.C. art. 779. Generally, doubt as to the existence, validity, or extent of building restrictions is resolved in favor of the unrestricted use of the immovable.
 
 See
 
 La. C.C. art. 783. However, the provisions of the Louisiana Homeowners Association Act, La. R.S. 9:1141.1,
 
 et seq.,
 
 supersede the Civil Code articles on building restrictions in the event of a conflict. La. C.C. art. 783. Regarding interpretation of building restrictions on property regulated by a homeowners association, La. R.S. 9:1141.4 provides that “[t]he existence, validity, or extent of a building restriction affecting any association property shall be
 
 liberally construed
 
 to give effect to its purpose and
 
 intent.”
 

 [4]
 

 (Emphasis added.)
 

 For purposes of the Louisiana Homeowners Association Act, a homeowners association is defined as “a nonprofit corporation, unincorporated association, or other legal entity, which is created pursuant to |12a declaration, whose members consist primarily of lot owners, and which is created to manage or regulate, or both, the residential planned community.” La. R.S. 9:1141.2(5). Each owner of a lot in the planned community regulated by a homeowners association is a mandatory member of that association, by virtue of such ownership. La. R.S. 9:1141.2(7).
 

 Building restrictions affecting property regulated by a homeowners association “may include the imposition of an affirma
 
 *378
 
 tive duty, including the affirmative duty to pay monthly or periodic dues or fees, or assessments for a particular expense or capital improvement, that are reasonable for the maintenance, improvement, or safety, or any combination thereof, of the planned community.” La. R.S. 9:1141.5(B). A homeowners association’s community or organizational documents, including any building restrictions, “shall have the force of law between the homeowners association and the individual lot owners and as between individual lot owners.” La. R.S. 9:1141.8. Remedies for breach of any obligation imposed upon lot owners or a homeowners association shall include damages, injunctions, or such other remedies as are provided by law.
 
 Id.
 

 The Fern Creek Building Restrictions
 

 Article II of the building restrictions is entitled “Use of Property.” Paragraph 1 of that article states that the subdivision was approved by the St. Tammany Parish planning commission for single-family use, and that the use of its lots was restricted to those uses allowed for property zoned A-2. Paragraph 2 further provides that “[a]ll improvements on the lots shall be made in accordance with Article VI below and
 
 thereafter maintained by the owner in a clean, safe, attractive condition and in good repair.”
 
 (Emphasis added.)
 

 |13Article III, “Prohibited Activities,” includes the following relevant provisions:
 

 3. No accumulation of storage of litter, lumber, scrap metal, building materials, new or used building materials of any kind shall be permitted in open areas of any lot, provided, however, that
 
 the storage of
 
 building materials and
 
 equipment shall be permitted during periods of new construction, remodeling and/or renovations of any improvements located upon any lot.
 

 4. ... [N]o junk vehicle,
 
 commercial vehicle, trailer truck, camper, camp truck, house trailer, mobile home, or other prefabricated trailer, house trailer, camper or
 
 boat
 
 or other
 
 machinery or equipment of any kind or character shall be kept upon any lot or in the street adjoining any lot in the subdivision;
 
 provided, however, that this restriction shall not apply to vehicles, mobile homes, boats, machinery and equipment enclosed and kept within an enclosed storage room or garage, but not in the front yard; ...
 
 Boats may be parked on the side yard, if, behind a wooden fence, and not visible from the front street.
 

 6. No owner will do or permit to be done any act upon his property which may be, or is, or may become, a nuisance to the other owners or which may be unsafe and hazardous.
 

 7. Individual water supply systems shall not be permitted unless approved by the Architectural Control Committee.
 

 8. No unsightly objects shall be permitted to remain upon any part of the lots and no refuse pile or trash shall be allowed to be placed or to remain anywhere thereon, including vacant lots.
 

 9. No changes in the elevations of the land, other than changes to meet government regulations, shall be made on the property without prior approval of the Architectural Committee.
 

 11. No sewerage treatment system permitted other than the community system provided for the entire subdivision.
 

 12.
 
 No work of any kind can be done on the property without the prior approval of the Architectural Committee.
 

 (Emphasis added.)
 

 |14 Article VI. “Architectural Control and Construction,” includes the following relevant language:
 

 
 *379
 
 1. Architectural Control
 
 No structure shall be erected on any lot or elsewhere on the Property by any person, firm or corporation without the approval of the Architectural Control Committee
 
 .... For purposes of this section,
 
 the word “structure” shall be broadly construed and shall include but not be limited to
 
 buildings, swimming pools,
 
 fences,
 
 sheds, walls, porches, signs, towers, driveways, walks, television antennae and dishes, storage facilities ... and
 
 any other thing erected or placed mi any part of the property.
 
 For purposes of this section,
 
 any addition to a present structure shall be considered a structure
 
 and shall require architectural approval.... In addition to the matters otherwise provided herein, architectural control shall include the approval of a structure’s size, structural construction materials, exterior appearance and location on the lot.
 

 Although Article VIII, “Annual Assessments and Carrying Charges,” primarily deals with the purposes and mechanism for the issuance of monthly and special assessments to members of the Association, it also sets forth the following provision, which reiterates and clarifies each member’s duty of maintenance of his property:
 

 2. Special Assessments
 

 [[Image here]]
 

 (b) Grounds and Facility Maintenance
 
 Should any property owner fail to properly maintain its lot or in any other manner allow its property to become detrimental to the aesthetic scheme of the Subdivision or adjoining property,
 
 or violate these restrictions in any manner, then the Association, its agents, employees, and/or contractors shall have the right to enter upon their property in order to take such corrective actions as will alleviate the situation.
 

 (Emphasis added.)
 

 Article XII, “Special Provisions,” Paragraph 8(a) reiterates the restriction that “[n]o fence of any kind shall be constructed on any lot without the prior approval of the Fern Creek Architectural Control Committee.”
 

 |
 
 ifl'he City’s Passive Role in the Alleged Violations
 

 The City’s first assignment of error addresses the nature of its role in relation to the alleged violations of the building restrictions. The City argues that it may not be held accountable for violations of building restrictions initiated by its predecessor in title (the Vanderbrooks) or other third persons. It also contends that because it neither actively used its property nor performed any work on it, it cannot be held responsible for any work, structure, or improvement done before it purchased the property. In effect, the City argues that its passive status as the owner of Lot 12 cannot expose it to injunctive relief or impose affirmative duties upon it for the prior acts of others in violation of the building restrictions.
 

 This assignment of error plainly has no merit. The building restrictions were properly recorded prior to the City’s purchase, and the act of sale makes specific reference to them. Thus, they are a continuing charge upon the property and binding upon the City as a subsequent owner.
 
 See
 
 La. C.C. art. 776, Revision Comments — 1977, (c); La. R.S. 9:1141.6(C)(1). The City’s argument runs counter to the fundamental principles that building restrictions constitute real rights running with the land, analogous to predial servitudes.
 
 See
 
 La. C.C. art. 777. In that regard, it should be noted that when a building restriction on particular immovable property is terminated by the lapse of
 
 *380
 
 two years from commencement of noticeable violation, it is the
 
 property
 
 that is freed of the restriction, rather than the owner.
 
 See
 
 La. C.C. art. 781. But because it is the owner of the burdened property who is subject to the charges and affirmative duties imposed, the owner of the property in continuing violation of a building restriction is considered the “violator” for purposes of injunctive relief and ^damages.
 
 See
 
 La. C.C. arts. 775 and 778;
 
 see also
 
 La. C.C. art. 779, Revision Comments— 1977, (d).
 

 Vagueness or Lack of Detail of Injunctive Relief
 

 In its second assignment of error, the City complains that the trial court’s judgment is “vague” and enjoins activities not violative of the building restrictions. Louisiana Code of Civil Procedure article 3605 requires that “[a]n order granting ... a final injunction ... shall describe in reasonable detail, and not by mere reference to the petition
 
 and other documents,
 
 the act or acts sought to be restrained.” (Emphasis added.)
 
 See, e.g., Miller v. Knorr,
 
 553 So.2d 1043 (La.App. 4th Cir. 1989), in which the judgment failed to describe an act sought to be restrained. We agree that the first numbered decretal paragraph of the judgment is impermissi-bly vague and overbroad based upon the foregoing standard, and should describe the enjoined activities with more detail, limited to those violations of the building restrictions that were proven at trial. We will accordingly amend that paragraph of the judgment to limit the injunction to those violations relating to the payment of Association dues or assessments by the City, the driveway, culvert, fence, equipment and machinery, debris and trash, and drainage pipe, as described in the following paragraphs. We will also amend certain other paragraphs of the judgment to provide the detail required by La. C.C.P. art. 3605, in conformity with the intent and tenor of the judgment and the evidence.
 
 [5]
 

 The Driveway and Culvert
 

 The City does not seriously contest the fact that the driveway and culvert were installed on Lot 12 by the Vanderbrooks without prior |17approval by the Architectural Control Committee. The trial court’s judgment does not make express reference to the existence of the driveway and culvert. However, implicit in its decision that the City be enjoined from “continuing to allow” violations of the building restrictions is the determination that those violations commencing prior to the City’s purchase be enjoined, and both parties’ briefs seem to acknowledge this point by addressing the issues relating to the driveway and the culvert, which issues were thoroughly addressed at trial. In accordance with our authority under La. C.C.P. art. 2164, we will therefore amend the judgment to provide that the City is ordered to remove the unapproved driveway and culvert within ninety (90) days of the date of issuance of this opinion.
 

 Residential Use
 

 In its third assignment of error, the City contends that the trial court erroneously found that it had used or allowed Lot 12 to be used as other than residen-tially-zoned property under the applicable zoning classification of St. Tammany Parish. The injunctive relief granted by the trial court simply requires the City to “maintain Lot 12 ... as a residential parcel as required by the restrictive covenants [building restrictions].” The building re-
 
 *381
 
 strictions in turn expressly refer to the zoning requirement of single-family use and the A-2 “suburban district” zoning classification.
 

 The evidence at trial showed that the City expressly acquired Lot 12 for “drainage purposes” and possibly for emergency access and evacuation, and that violations of the building restrictions related to the residential character and general plan of the subdivision existed. We find no error in the trial court’s decision to impose the injunctive relief described above. However, we will amend the judgment to clarify that relief in appropriate detail.
 

 |
 
 Machinery and Equipment
 

 In its fourth assignment of error, the City contends that the trial court erred in enjoining the presence of equipment and machinery of any kind other than as allowed by the building restrictions, as the building restrictions contain no such prohibition. We disagree. Article III, Paragraph 4 directly addresses the presence of machinery and equipment not stored within approved storage rooms or garages, and Paragraph 8 of the same article otherwise limits the visible presence of equipment to “periods of new construction, remodeling, and/or renovations of any improvements located upon any lot.” The evidence and testimony support the trial court’s determination that the City at the very least tacitly allowed the storage or parking of construction equipment, machinery, a boat and boat trailer, and motor vehicles upon Lot 12. This assignment of error has no merit. However, in line with our prior determination that the injunctive relief should be more specific, we will also amend the judgment to more particularly describe the character of the prohibited machinery and equipment.
 

 The Fence
 

 In its fifth assignment of error, the City contends that the evidence at trial failed to demonstrate the existence, type, or location of the fence supposedly existing at the time of its purchase of Lot 12. The City is plainly in error on this point. Mr. Scalfano unequivocally testified that he personally erected a wood privacy fence across a portion of Lot 12 adjoining Golden Glen. Mr. Vanderbrook confirmed the existence of that fence when he and his wife purchased Lot 12 from the Scalfanos. The undisputed testimony of Mr. Scalfano, Mr. Vanderbrook, Ms. Huffman, and Mr. Huffman, as well as the diagram and plat submitted by Mr. [ )9Vanderbrook with regard to his proposed fence, proved the existence, appearance, and location of the six-foot wood privacy fence erected by Mr. Scalfano.
 

 We agree with the trial court’s conclusion that the removal of the existing privacy fence erected by Mr. Scalfano required the approval of the Committee, and the unapproved removal of that fence, whether by the City or by third parties, constituted a violation of the building restrictions, warranting injunctive relief. This interpretation accords with the plain intent of the building restrictions that the owners properly maintain the improvements on their property in good repair, and that any “work” undertaken that would affect the residential character and existing aesthetic scheme of the subdivision be approved by the Architectural Control Committee.
 
 [6]
 
 Where a building re
 
 *382
 
 striction is couched in general terms, the reasonableness of the association’s enforcement of the restriction in a particular case may be weighed by the courts, and as long as the discretionary power is exercised reasonably and in good faith, the restriction is enforceable.
 
 See Cosby,
 
 05-0470 at pp. 8-9, 942 So.2d at 476-77;
 
 Í626 Corp. v. Memam,
 
 329 So.2d 885, 889 (La.App. 1st Cir.),
 
 writ refused,
 
 332 So.2d 800 (La. 1976). This interpretation also comports with the statutory mandate of La. R.S. 9:1141.4 that the courts
 
 liberally
 
 construe the extent of a building restriction regulated by a homeowners association 12n“to give effect to its purpose and intent.” The trial court’s decision on this issue is correct, and this assignment of error has no merit.
 

 The Drainage Pipe
 

 The uncontradicted testimony and documentary evidence confirmed that the City permitted the owners of Lot 62 in Golden Glen to install a plastic pipe draining water from their swimming pool onto Lot 12. A photograph documenting the open drainage pipe coming from the direction of the swimming pool and the shallow drainage ditch was also introduced into evidence. In its oral reasons for judgment, the trial court made a point of emphasizing the drainage pipe’s obvious character as a violation of the building restrictions. We agree. Whether characterized as a nuisance, unsightly object, “individual water supply system,” or individual “sewerage treatment system,” or any combination of the foregoing, the drainage pipe is obviously out of character with the general plan of Fern Creek. The trial court’s finding in that regard is not manifestly erroneous. This assignment of error has no merit.
 

 Unsightly Objects, Refuse Piles, Debris, and Trash
 

 The evidence and testimony clearly support the trial court’s finding that the City permitted debris and trash to be placed and to remain on Lot 12, in direct violation of Article III, Paragraph 8, and possibly other provisions requiring maintenance of property in clean and attractive condition. The trial court’s finding is not manifestly erroneous. The City’s seventh assignment of error has no merit.
 

 Attorney Fees
 

 The building restrictions provide that if the Association files suit to enforce any provision of the building restrictions, “[t]he party cast in judgment shall pay all attorney’s, fees and costs.” As we find no manifest |2ierror in the trial court’s express and implicit findings of violations of the building restrictions, warranting the injunctive relief granted, we likewise find no error in its determination that an award of attorney fees was appropriate under the express terms of the building restrictions. The City’s assignment of error on this issue has no merit.
 

 As to the Association’s answer to the appeal, seeking an increase in the trial court’s award of attorney fees, we note that despite a provision fixing attorney fees in the parties’ contract, courts may inquire as to the reasonableness of
 
 *383
 
 the attorney fees as part of their prevailing, inherent authority to regulate the practice of law.
 
 City of Baton Rouge v. Stauffer Chem. Co.,
 
 500 So.2d 397, 401 (La.1987). In making an award of attorney fees, a court is not bound by the amount actually charged by the attorney.
 
 Jackson Square Toume Home Ass’n., Inc. v. Hamigan,
 
 38,289, p. 10 (La.App. 2nd Cir.3/3/04), 867 So.2d 960, 965-66;
 
 see also
 
 La. R.S. 9:1145. A reasonable attorney fee is determined by the facts of an individual case. The trial court has the ultimate discretion to determine the amount of attorney fees that may be recovered, based on the court’s own knowledge, the evidence, and the court’s observation of the case and the record.
 
 Filson v. Windsor Court Hotel,
 
 07-0755, pp. 6-7 (La.App. 4th Cir.7/23/08), 990 So.2d 63, 67. We have reviewed the trial court’s award of attorney fees based upon the record, and find no abuse of its discretion or other error. Accordingly, we deny in part the Association’s answer to the appeal.
 

 Further, although we disagree with the Association’s contention that the City’s appeal is frivolous and that additional attorney fees should be awarded on that basis, we agree that the Association is entitled to additional attorney fees by virtue of the language of the building | ^restrictions. After review of the record and the briefs and after consideration of oral argument, we award the Association additional attorney fees of $1,500.00 in connection with the appeal and its answer to the appeal.
 

 Unpaid Assessments or Dues
 

 The trial court ruled against the Association on its claim for recovery of unpaid quarterly assessments or dues from the City, on the grounds that the supporting statement of account was not readily understandable and therefore nonproba-tive of the claimed amount due from the City. We must respectfully disagree. Our review of the record, including the statement itself and explanatory testimony of Ms. Huffman, essentially uncontradicted as to the amount, convinces us that the trial court was clearly wrong in failing to award the Association the amount of $1,420.00 owed as of the time of trial.
 
 [7]
 
 We will accordingly amend the trial court judgment to award that amount, together with the conventional annual interest of 12% authorized on said amount by the building restrictions.
 

 DECREE
 

 The judgment of the trial court, rendered on June 3, 2008, is amended in the following respects:
 

 Paragraph 1 is amended to read as follows:
 

 1. The City of Mandeville, its agents, employees and all other persons, firms or corporations acting or claiming to act on its behalf, are permanently enjoined from violating or continuing to allow violations of the building restrictions or restrictive covenants set forth in the Covenant, Deed Restrictions and Obligations for Fern Creek Subdivision in St. Tammany Parish, relating to the driveway, culvert, fence, equipment and machinery, debris and trash, and drainage pipe on Lot 12 of Fern Creek Subdivision, as further described in this judgment, and any such violations of these restrictive covenants brought to the Court’s attention will result in the 12sCourt assessing an appropriate fine against the City of Mandeville for such violation. The City of Mandeville is fur
 
 *384
 
 ther ordered to remove the unapproved driveway and culvert on Lot 12 within ninety (90) days of the date of issuance of the opinion of the Court of Appeal, First Circuit.
 

 Paragraph 3 is amended to read as follows:
 

 3. The City of Mandeville is ordered to maintain Lot 12, Fern Creek Subdivision for single-family residential use in accordance with the Covenant, Deed Restrictions and Obligations for Fern Creek Subdivision in St. Tammany Parish, and in accordance with the permitted uses of Section 2.04 of the zoning ordinances of the Parish of St. Tammany applicable to A-2 Suburban Districts, insofar as they are compatible with the Covenant, Deed Restrictions and Obligations for Fern Creek Subdivision. Any “miscellaneous uses” or “similar and compatible uses,” other than residential uses, of Lot 12 under Section 2.04 must otherwise comply with the building restrictions or restrictive covenants for Fern Creek Subdivision, including but not limited to the requirement that the City properly maintain its lot and in no manner allow its property to become detrimental to the aesthetic scheme of the Subdivision or adjoining property.
 

 Paragraph 4 is amended to read as follows:
 

 4. The City of Mandeville is ordered to remove from Lot 12, Fern Creek Subdivision, and prevent the keeping, storage, or parking of all junk vehicles, commercial vehicles, trailer trucks, campers, camp trucks, house trailers, mobile homes, boats, trailers, tractors, other motor vehicles, front-end loaders, “Bobcats,” and other construction equipment and machinery, except as authorized by Article III, Paragraph 4 of the Covenant, Deed Restrictions and Obligations for Fern Creek Subdivision.
 

 The answer of the plaintiff-cross-appellant, the Fern Creek Owners Association, Inc., is granted in part, and the judgment of the trial court is further amended to add the following:
 

 IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment rendered in favor of the plaintiff, Fern Creek Owners Association, Inc., for the sum of ONE THOUSAND FOUR HUNDRED TWENTY AND NO/100 DOLLARS ($1,420.00), representing unpaid quarterly dues or assessments, against the defendant, the City of Mandeville, said sum to bear interest of twelve percent (12%) per an-num, in accordance with Article VIII, Paragraph 3 of the Covenant, Deed Restrictions and Obligations for Fern Creek Subdivision.
 

 |24As amended, and in all other respects, the judgment of the trial court is affirmed.
 

 Finally, the plaintiff-cross-appellant, the Fern Creek Owners Association, Inc., is awarded additional attorney fees of ONE THOUSAND FIVE HUNDRED AND NO/100 DOLLARS ($1,500.00) in connection with its defense of this appeal, and judgment is rendered accordingly against the defendant-appellant, the City of Mandeville. All costs of this appeal are assessed to the defendant-appellant.
 

 JUDGMENT AMENDED AND, AS AMENDED, AFFIRMED.
 

 KUHN and GUIDRY, JJ„ concur.
 

 [1]
 

 . Included in the same document was an amendment (not relevant for our purposes) related to the minimum area or square footage of living areas for residences.
 

 [2]
 

 . We emphasize that this is not a case of expropriation or annexation of immovable property by a municipality.
 

 [3]
 

 . For some reason, not apparent from the record, the supplemental and amending petition omits any reference to Mr. and Ms. Huffman as plaintiffs. In its brief, the City makes
 
 *375
 
 objection to the trial court’s ruling permitting the filing of the supplemental and amending petition, on the grounds that its allegations do not comply with the terms of La. C.C.P. art. 1155, governing supplemental (as opposed to amended) pleadings. Leaving aside the issues of whether the City has properly assigned the trial court’s action as error and whether its challenge is timely, we conclude that the trial court did not abuse its discretion in permitting the filing of the supplemental and amending petition.
 
 See White v. Cumis Ins. Soc’y.,
 
 415 So.2d 574, 578 (La.App. 3rd Cir.),
 
 writ denied,
 
 420 So.2d 164 (La. 1982).
 

 [4]
 

 . "Association property" is statutorily defined as "all the property either held by the association or commonly held by the members of the association, or both, and lots privately held by members of the association." La. R.S. 9:1141.2(1).
 

 [5]
 

 . The record reflects that the trial court's judgment was prepared by counsel for the Association and submitted to the trial court in compliance with Rule 9.5 of the Louisiana Rules for District Courts.
 

 [6]
 

 . This interpretation is reinforced by the intent behind the requirements of Article VI, Paragraph 1 that any “addition" to an existing structure also requires approval by the Architectural Control Committee, and that “ architectural control shall include the approval of a structure's size, structural construction materials, exterior appearance and location on the lot.” In its brief, the City indulges in extended argument concerning
 
 *382
 
 the supposed vagueness and overbreadth of the term "work of any kind,” requiring approval by the Committee, as used in Article III, Paragraph 12. The City has posited that a literal interpretation would require an owner to seek approval for any maintenance work, such as grass cutting or tree trimming. We disagree. Considering the building restrictions as an integrated whole and uniform general plan, the "work of any kind” must be interpreted as referring to the placement of any "structure” requiring approval, as described in Article VI, Paragraph 1, or work relating to a change in elevation of the property, as described in Article III, Paragraph 9.
 

 [7]
 

 . Although the City had paid $1,580.00 toward its quarterly assessments due as of December 2007, a balance of $1,420.00 remained as of the time of trial.