STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

**09-1310**

**KIMBERLY CARTER, ET AL.**

**VERSUS**

**LOUISIANA MEDICAL MUTUAL INSURANCE CO., ET AL.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2007-4537
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SYLVIA R. COOKS**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, James T. Genovese, and David E. Chatelain[*], Judges.

**AFFIRMED.**

**Daniel E. Broussard, Jr.**
**Broussard, Halcomb & Vizzier**
**912 5th Street**
**P.O. Box 1311**
**Alexandria, LA 71309-1311**
**(318) 487-4589**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
      **Kimberly Carter, et al.**

**John E. Bergstedt**
**J. Gregory Bergstedt**
**Jodi C. Andrews**
**The Bergstedt Law Firm**
**One Lakeshore Drive, Suite 800**
**Lake Charles, LA 70629**
**(337) 436-4600**
**COUNSEL FOR DEFENDANT/APPELLEE:**
      **Louisiana Medical Mutual Ins. Co.**

---

[*] Honorable David E. Chatelain participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**COOKS, Judge.**

In this medical malpractice case, Plaintiffs, Kimberly and Thomas Carter, appeal a jury verdict in favor of Defendant, Dr. Clark Gunderson, finding he did not deviate from the appropriate standard of care in his treatment of Mrs. Carter. Finding no error in the jury's verdict, we affirm.

## FACTS AND PROCEDURAL HISTORY

On November 22, 2001, while visiting with family in Lake Charles, Louisiana, Kimberly Carter, a resident of Little Rock, Arkansas, stepped in a hole in the ground and injured her right leg. She was transported immediately by ambulance to Women's and Children's Hospital in Lake Charles, where she was evaluated and treated by Dr. Clark Gunderson, the orthopedic surgeon on call when Mrs. Carter arrived at the hospital.

Dr. Gunderson had x-rays performed and determined she suffered from a "spiral fracture at the juncture of the middle and distal third of the right tibia." Dr. Gunderson advised Mrs. Carter surgery would be required. He told her she could have the surgery performed in Lake Charles by him, another surgeon of her choice, or return to Little Rock for surgery. Mrs. Carter and her husband decided to remain in Lake Charles and have Dr. Gunderson perform the surgery. Two days later, on November 24, 2001, Dr. Gunderson performed surgery on Mrs. Carter's leg to reduce the fractures.[2] A closed intramedullary rod was placed in her leg. The post-operative report stated, "[e]xcellent purchase was obtained. The rotation was felt to be appropriate." She was discharged from the hospital on November 28, 2001. She remained in Lake Charles for a few more days in order to have one more post-operative visit with Dr. Gunderson. Dr. Gunderson gave the following instructions

---

[2] Ms. Carter was transferred to Lake Charles Memorial Hospital for the surgery at the request of Dr. Gunderson, who was more familiar with that hospital's operative personnel and procedures.

to Mrs. Carter upon her return to Arkansas:

> 6 days, wounds okay. Will need staples out next week. Going home tomorrow to see ortho at home next week. Discussed future. Continue boot. See M.D. next week at home.

Mrs. Carter returned to Arkansas on December 1, 2001, and continued her post-operative care.

After her return home, Mrs. Carter's post-operative care was provided by Dr. Johannes Michael Gruenwald, a board-certified orthopaedic traumatologist at the University of Arkansas Medical Center. A request for medical records was made to Dr. Gunderson on December 7, 2001. The records were mailed by Dr. Gunderson's staff on December 11, 2001 to Dr. Gruenwald. According to Dr. Gunderson, he was never contacted again by either Mrs. Carter or her treating physicians in Arkansas. However, Dr. Gruenwald's staff reported they never received the medical records sent by Dr. Gunderson in December of 2001.

In the course of Mrs. Carter's treatment with Dr. Gruenwald, she was placed in a cast and instructed not to put weight on her leg. She eventually began physical therapy. After she experienced trouble during physical therapy, it was discovered there was a mal-rotation in excess of fifteen degrees. At trial, Plaintiffs alleged this mal-rotation resulted from an incorrect surgical alignment of the bones by Dr. Gunderson during the surgical procedure performed on November 24, 2001. A subsequent surgical procedure was performed to fix the mal-rotation.

A complaint was filed requesting a medical panel review pursuant to La.R.S. 40:1299.41.1, et seq. The complaint alleged Dr. Gunderson failed to adhere to the accepted standards of medical care in his treatment of Mrs. Carter. After hearing the evidence and reviewing the submitted documents, the medical review panel issued a unanimous opinion, concluding "the evidence does not support the conclusion that

the defendant, Dr. Clark Gunderson, failed to comply with the appropriate standard of care as charged in the complaint." The panel elaborated:

> The initial treatment by Dr. Gunderson was well within the standard of care. The procedure performed by Dr. Gunderson was performed in a timely and appropriate manner, and his choice of instrumentation was within the standard of care. Also, our review of the post-operative x-rays indicate acceptable alignment, even in light of the patient's body habitus. Dr. Gunderson rendered no further treatment after that point.

On August 14, 2007, the instant suit was filed on behalf of Mrs. Carter, her husband (Thomas W. Carter), and their minor children. Plaintiffs sought damages for Mrs. Carter's past and future physical pain and suffering, mental anguish, past and future loss of enjoyment of life, permanent disfigurement, and past and future medical expenses. Thomas and the children requested damages for their loss of consortium.

After a three-day jury trial, the jury returned a verdict finding Dr. Gunderson's conduct in treating Mrs. Carter did not deviate below the applicable standard of care. From this verdict, Plaintiffs have appealed, asserting the following assignments of error:

> 1. The jury manifestly erred in finding that Dr. Gunderson did not deviate below the applicable standard of care and in not accepting the sworn testimony of Plaintiffs concerning the post-operative statements of Dr. Gunderson concerning the alignment of the right leg of Mrs. Carter.
>
> 2. The trial court erred as a matter of law in denying Plaintiffs' motion in limine objecting to the expert testimony of Dr. Stanley Foster because he did not disclose the fact that he listed Dr. Gunderson as a personal reference on his curriculum vitae.

## ANALYSIS

The Louisiana Supreme Court outlined the burden of proof and appellate standard of review in medical malpractice actions in *Martin v. East Jefferson General Hospital*, 582 So.2d 1272, 1276-77 (La.1991):

> In a medical malpractice action against a physician, the plaintiff carries a two-fold burden of proof. The plaintiff must first establish by

a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. LSA-R.S. 9:2794; *Smith v. State through DHHR*, 523 So.2d 815, 819 (La.1988); *Hastings v. Baton Rouge General Hospital*, 498 So.2d 713, 723 (La.1986). Resolution of each of these inquires are determinations of fact which should not be reversed on appeal absent manifest error. *Housley v. Cerise*, 579 So.2d 973 (La., 1991); *Smith*, 523 So.2d at 822; *Rosell v. ESCO*, 549 So.2d 840 (La.1989); *Hastings*, 498 So.2d at 720. . . .

. . . .

. . . "if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Sistler v. Liberty Mutual Ins. Co.*, 558 So.2d 1106, 1112 (La.1990); *Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978) . . . . where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *Rosell v. ESCO*, 549 So.2d at 844; *Housley*, supra.

In *Charpentier v. Lammico Ins. Co.*, 606 So.2d 83, 87 (La.App. 3 Cir. 1992),

this court stated:

The law does not require perfection in medical diagnoses and treatment. On the contrary, a doctor's professional judgment and conduct must be evaluated in terms of reasonableness under the then existing circumstances, not in terms of results or in light of subsequent events. *Broadway v. St. Paul Insurance Co.*, 582 So.2d 1368 (La.App. 2d Cir.1991), and the cases cited therein. When the alleged negligence of a specialist is at issue, only those qualified in that specialty may offer expert testimony and evidence of the applicable standard of care. *Fox v. Our Lady of Lourdes Regional Medical Center*, 550 So.2d 379 (La.App. 3rd Cir.1989), *writs denied*, 556 So.2d 1263 and 556 So.2d 1264 (La.1990). When the expert opinions contradict concerning compliance with the applicable standard of care, the trial court's conclusions on this issue will be granted great deference. It is the sole province of the factfinder to evaluate the credibility of such experts and their testimony. *Arceneaux*, supra; *Broadway*, supra.

After a thorough review of the record, we cannot say the jury's findings were

unreasonable in light of the record reviewed in its entirety.

Plaintiffs' primary argument is that the mal-rotation which necessitated the

second surgery was caused by an incorrect surgical alignment of the bones by Dr.

Gunderson. Defendants, on the other hand, presented evidence at trial in an attempt to show the mal-rotation more likely than not occurred during the post-operative care Mrs. Carter received after returning home to Arkansas. Defendants maintained there was no indication of any misalignment of bones or mal-rotation in any of the post-operative x-rays taken in the days following the November 24, 2001 surgery.

Post-operative x-rays were taken the day after surgery, on November 25, 2001, which were reported by the radiologist as "orthopedic internal fixation of distal, tibial fracture in satisfactory position." The report also stated "front and lateral views were obtained and shows a comminuted oblique fracture through the distal shaft of the tibia which has been transfixed by an intramedullary rod, satisfactory apposition, and alignment present along the primary fracture site." Dr. Barry Reimer, the Professor and Chair of Orthopaedic Surgery at Louisiana State University, testified these x-rays indicated there were no alignment problems at this point in time. Dr. Gruenwald could not establish that he ever reviewed these particular x-rays.

Mrs. Carter was first treated by Dr. Gruenwald on December 13, 2001. X-rays were taken on that date. The x-rays do not indicate any mal-rotation. Dr. Gruenwald gave the following impression of Mrs. Carter's ankle:

> Post surgical fixation of the comminuted right tibia fracture with *good alignment* and displacement of the fracture fragments. The proximal fibular fracture is also minimally displaced.

(Emphasis added.)

Further, a CT scan ordered on December 13, 2001, and taken on December 20, 2001, makes no reference to any mal-rotation of the lower leg.

X-rays were also ordered and taken on Mrs. Carter's February 21, 2002 visit with Dr. Gruenwald. The comments to the x-rays indicate healing at the fracture site and "no change in the integrity of the hardware." There is no reference in that report

to any mal-rotation.

Mrs. Carter next saw Dr. Gruenwald on May 8, 2002. The x-rays on that date again showed no change in the integrity of the hardware and again made no mention of any mal-rotation. On that date it was determined that she could begin physical therapy.

As Defendants note, both Mrs. Carter's and her husband's testimony indicate the question of a second surgery did not occur until after she commenced physical therapy. Defendants further point out physical therapy was never suggested by Dr. Gunderson. Defendants also note Dr. Michael Griffey, the Chief Resident of the Department of Orthapaedics at the University of Arkansas Medical Center, who evaluated Mrs. Carter on July 25, 2002, concluded "[h]er initial injury was in 12/01 treated at an outside facility and *subsequently developed* the malunion with 20 degrees of external rotation of the right distal fibula." Defendants point to the lack of documentation of any mal-rotation prior to Mrs. Carter undergoing physical therapy. Dr. Reimer was adamant in his opinion it would be "incredulous" for any physician not to document any signs of mal-rotation if detected. Dr. Reimer also noted if mal-rotation is detected in the weeks just following surgery, it is much easier and significantly less invasive to the patient to repair it at that time.

After a thorough review of the record, we find the evidence presented to the jury more than allowed for a reasonable conclusion that the mal-rotation suffered by Mrs. Carter occurred subsequent to her treatment by Dr. Gunderson.

Plaintiffs also criticized Dr. Gunderson's decision to use only a single-locking screw on the intramedullary rod. Dr. Gruenwald testified he believed it was necessary to use two screws, one each at the top and bottom. Contrary to Dr. Gruenwald's opinion, all three members of the medical review panel and Dr. Reimer

testified the use of one screw by Dr. Gunderson in this case was appropriate. Dr. Reimer elaborated on this issue:

> Q. Okay. Now, would you explain to me, sir, in what circumstances you might use an interlocking screw on both ends and which circumstances you might use only one end?
>
> A. I have actually written fairly extensively on this subject.
>
> Q. Okay.
>
> A. I would use in a low energy fracture a locking screw on only one end. First of all, if it's in the middle of the bone, I would use none. If it was on one end of the bone, as this was, I would lock the end where the fracture is closer to. So, if it's near the end of the bone, I would lock that end of the bone and leave the other unlocked and keep the patient probably in a long-leg device and restrict weight bearing.
>
> Q. And this is what you understood Dr. Gunderson did and what he recommended in terms of following?
>
> A. Exactly what he did, yes.

Thus, the jury was certainly within its discretion to disregard Dr. Gruenwald's testimony that "the recommendation for all the surgeons nowadays is please lock both ends." Dr. Gruenwald later acknowledged this was *not* a recommendation of the American Academy of Orthopedic Surgeons.

Plaintiffs also point to Mrs. Carter's testimony that Dr. Gunderson commented to her about the alignment of her right leg shortly after the surgery while she was still in the hospital and in the office visit of November 30, 2001. Dr. Gunderson denied making such statements to either Mrs. Carter or her husband. Such credibility determinations are the sole province of the trier of fact, and it is not appropriate for an appellate court to substitute its opinion unless we find manifest error. *Cosby v. Holcomb Trucking, Inc.*, 05-470 (La. 9/6/06), 942 So.2d 471. We find no manifest error in the jury's factual determinations.

Lastly, Plaintiffs also argued the trial judge erred as a matter of law in denying

their motion in limine objecting to the expert testimony of Dr. Stanley Foster because he did not disclose the fact that he listed Dr. Gunderson as a personal reference on his curriculum vitae. We note initially that Dr. Foster was questioned at length both in his pre-motion deposition and at trial concerning his relationship with Dr. Gunderson. Thus, the jury was fully aware of any personal relationship between Dr. Foster and Dr. Gunderson. Further, we note Dr. Foster's testimony was not in any way different from Dr. Reimer's and the other medical review panel members. Thus, even if there was error in allowing Dr. Foster to testify, there is nothing to suggest that the admissible evidence would not have resulted in the same jury verdict.

## DECREE

For the foregoing reasons, the lower court judgment is affirmed. All costs of this appeal are assessed to Plaintiffs-Appellants.

**AFFIRMED.**