# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## CA 12-502


DONALD COLLINS

VERSUS

**NATIONAL HEALTHCARE OF LEESVILLE, INC. D/B/A BYRD REGIONAL HOSPITAL, ET AL.**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. 80,445, DIV. C
HONORABLE JAMES RICHARD MITCHELL, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**BILLY HOWARD EZELL**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Oswald A. Decuir, Billy Howard Ezell, and Phyllis M. Keaty, Judges.


**AFFIRMED AS AMENDED.**


**Walter Flanders Clawson**
**400 Travis Street, Suite 908**
**Shreveport, LA 71101-3116**
**(318) 424-1600**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Louisiana Patient's Compensation Fund**

**Philip Gardiner Hunter**
**Hunter & Morton**
**P. O. Box 11710**
**Alexandria, LA 71315-1710**
**(318) 487-1997**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Donald Collins**

**S. Christie Smith, IV**
**The Smith Law Firm**
**P. O. Drawer 1528**
**Leesville, LA 71496-1528**
**(337) 239-2244**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **David Steiner, M.D.**

**EZELL, Judge.**

This appeal in a medical malpractice case presents several questions pertaining to the damages that the jury awarded for breaches of the standard of care by Dr. David Steiner in his treatment of Mr. Donald Collins, who suffered an open, bilateral fracture of his left forearm. Dr. Steiner claims that any breaches of the standard of care by him were not substantial factors in the damages sustained by Mr. Collins. Dr. Steiner further asserts that the trial court erred in allotting responsibility for the medical expenses incurred after the date of injury to him rather than the Louisiana Patient's Compensation Fund (PCF). Mr. Collins asserts that the damages he was awarded were inadequate.

## FACTS

On June 28, 2003, Mr. Collins was working at his farm trying to load a bull when the bull flipped him over. He was sixty-three years old at the time. As a result of the incident, Mr. Collins broke both the radius and ulna in his forearm. A friend was with Mr. Collins at the time of the accident and transported him to Byrd Regional Hospital. Mr. Collins arrived at the hospital around 1:10 p.m.

Chris Mitchell, the emergency room (ER) nurse, performed the initial evaluation of Mr. Collins. Dr. Jerry Troy was the ER doctor on call and performed the initial treatment of Mr. Collins. An x-ray of the arm was taken. Dr. Troy diagnosed Mr. Collins with an open, bilateral fracture of the left forearm. He contacted Dr. David Steiner, the orthopedic surgeon on call, at 1:25 p.m. Dr. Steiner was out of town at the time. Although Dr. Troy could not remember talking to Dr. Steiner, he testified that he would have told him that both bones were broken and that it was an open fracture. Mr. Mitchell also testified that he would always indicate that it was an open fracture. Dr. Steiner denied that he was told it was an open fracture.

Pursuant to Dr. Steiner's order, a tetanus shot was administered. Physician's orders indicate that Mr. Collins was admitted to Dr. Steiner's care with an open fracture to the left forearm at 2:55 p.m. His vital signs were to be monitored every four hours, and he was put on bed rest with bathroom privileges. Mr. Collins was put on IV fluids, and Neosporin was administered to his abrasions. The orders further provided that Mr. Collins was not to be given anything by mouth in order to prepare him for surgery.

At the time, Dr. Steiner was in Baton Rouge on some church business. He testified that he continued with his church business for about three-and-a-half hours after receiving the call before starting the three-hour drive back to Leesville. Dr. Steiner testified that if he had known the wound was open he would have sent Mr. Collins to another hospital. He testified that he did not tell anyone what time he would get back. Dr. Steiner did admit that he knew that there was a laceration over the area. Dr. Troy indicated that had he known Dr. Steiner was out of town, he would have transferred Mr. Collins to another hospital because it was an open fracture.

Lori Allen was the LPN who took care of Mr. Collins when he was admitted to the hospital. When he was admitted, his left arm was already in a sling and Ace bandage. He requested more pain medication, but Ms. Allen noted that it was too early to give him any additional medication. At 5:00 p.m., Ms. Allen noted that Mr. Collins' left forearm was hurting and swelling. Mr. Collins also complained that his fingers were swelling and stiff, so Ms. Allen loosened the bandage. An icepack was also applied, and Mr. Collins started feeling better. At 6:30 p.m., Mr. Collins was still complaining of pain, so he was given a dose of morphine. At 7:00 p.m., Mr. Collins continued to complain of pain and it was noted that Dr. Steiner still had not arrived. At 7:40 p.m., Mr. Collins indicated that he was very anxious about surgery. He was also told that it was not time for any pain medication.

2

Dr. Steiner finally arrived at the hospital around 9:10 p.m. Dr. Steiner indicated that there was a comminuted fracture of the ulna because it was broken in more than two places. There was an oblique fracture, one break at an angle, of the radius. Dr. Steiner noted some dirt around the laceration but no bone was exposed. At 10:00 p.m., Mr. Collins was taken to surgery. Dr. Steiner noted that there were tears in the tissue that went down to the bone. He agreed that it is not ideal to leave a fracture open for a long time.

Dr. Steiner repaired the broken ulna and radius in the left forearm. He utilized a nine-hole plate on the ulna with three screws above and three screws below. Dr. Steiner did not put screws in all the holes. Dr. Steiner testified that when he repaired the radius, he made a decision to use a smaller plate because he did not want to dissect too much tissue. Although he would have liked to use a seven or eight-hole plate, he used a six-hole plate.

When Dr. Steiner pulled the arm out to full length, it became obvious that Mr. Collins had compartment syndrome, a serious condition that involves increased pressure in the muscles which can lead to muscle and nerve damage. Dr. Steiner then performed a fasciotomy, a procedure in which surgical cuts are made in the fascia. The fascia surrounds the muscle tissue, nerves, and blood vessels, and a fasciotomy relieves the pressure caused by swelling. Due to the fact that a fasciotomy had been performed, Dr. Steiner did not close the skin at the end of the procedure because there was too much swelling. He used a sugar-tong splint to accommodate the soft-tissue swelling.

Dr. Steiner next saw Mr. Collins on July 2, 2003. An x-ray was taken. Mr. Collins was concerned with the color and odor of the dressing, but Dr. Steiner thought it appeared satisfactory. On July 3, 2003, Dr. Steiner performed a debridement and

3

secondary closure of the open wounds. There was still some swelling, so Dr. Steiner left a small portion in the center of the outer wound open.

Mr. Collins returned to see Dr. Steiner on July 14, 2003. Dr. Steiner noted that the left hand was beginning to appear normal with good color and wrinkles indicating that the swelling had decreased. On July 15, 2003, the open wound was debrided and closed. Dr. Steiner noted that the other incisions had healed nicely.

When Mr. Collins returned to see Dr. Steiner on July 21, 2003, he was complaining of numbness in the forearm and back of the hand. Dr. Steiner opined that some of the numbness was from tightness of the ace wrap.

At the July 30, 2003 appointment, it was noted that Mr. Collins had limited motion in his left thumb and discomfort with supination and pronation. A long, synthetic cast was applied. X-rays revealed that the position of the bones was good. Dr. Steiner noted that he did not see as much healing as he would like to see. He contemplated that a bone-growth stimulator may be necessary.

Mr. Collins returned to see Dr. Steiner on August 15, 2003, complaining of a knot under the cast at the elbow and worrying about the possibility of infection. The cast was loosened, and he was assured that there was nothing to worry about.

On August 27, 2003, the cast was removed and the lateral incision appeared to have a slow healing spot about mid-incision. X-rays revealed that the position was good but that there appeared to be a bone infection of the radius. Dr. Steiner obtained cultures of the open wound which did not indicate an infection at that point. At that time, Mr. Collins was given a prescription for Augmentin, an antibiotic. A white-cell scan on August 28 revealed two small, closely associated focal areas of increased white blood cell activity in the mid aspect of the radial plate representing osteomyelitis, a bone infection.

At this point in time, Mr. Collins went to see Dr. John DeLapp, another orthopedic surgeon, seeking a second opinion. Dr. DeLapp first saw Mr. Collins on August 29, 2003. Dr. DeLapp opined that the metal plate utilized on the radius was not adequate. Dr. DeLapp felt that there was inadequate fixation of the radius. It was decided that Dr. DeLapp would perform an open hardware removal of the radius and an appropriate fixation.

On September 3, 2003, Mr. Collins was admitted to Byrd Regional Hospital. During the procedure to remove the hardware, Dr. DeLapp observed severe segmental bone loss and marked infection of the radius. Dr. DeLapp contacted Dr. Mark Brinker, an orthopedic surgeon in Houston who specializes in difficult fractures. Dr. Brinker agreed to see Mr. Collins on September 8, 2003. At Dr. Brinker's recommendation, Dr. DeLapp preformed another repeat irrigation and debridement on September 5, 2003. Antibiotic-impregnated beads were placed on the infection site.

When Dr. Brinker saw Mr. Collins on September 8, it was very obvious that he had a musculoskeletal infection involving muscle, soft tissues, and bone. The first part of Dr. Brinker's treatment on September 12, 2003, involved debridement to remove anything that was bad, including bone. On September 15, Dr. Brinker again cleaned out the area. The final procedure by Dr. Brinker was on September 16, 2003, when Dr. Brinker once again washed the area out and put in a piece of allograft bone from a cadaver. Dr. Brinker explained that there was a gap between the natural bones in the radius where the infected bone was removed. The allograft bone was placed on a rod like a shish-ka-bob and connected to the natural bone. Dr. Brinker explained that it would then take time for a "creeping substitution" to take place in which the bone would grow back together with the use of the cadaver bone. Dr. Brinker continued to follow the progress of the bone allograft. Dr. Brinker testified that it took four years for the allograft to consolidate.

5

Pursuant to La.R.S. 40:1299.47, Mr. Collins sought a review with a medical review panel regarding his treatment by Dr. Steiner at Byrd Regional Hospital. All three doctors concluded that Byrd Regional Hospital did not breach any standard of care it owed Mr. Collins. Two of the doctors determined that Dr. Steiner did not breach the standard of care owed to Mr. Collins. The third doctor concluded that Dr. Steiner breached the standard of care owed to Mr. Collins but concluded that there was no way to determine whether or not any of Mr. Collins' damages were caused by the breach.

Thereafter, Mr. Collins filed a suit against Dr. Steiner and Byrd Regional Hospital. The claim against Dr. Steiner was submitted to a jury on October 25 – 29, 2010. After the trial, Byrd Regional Hospital was dismissed from the proceedings. The jury found that Dr. Steiner's treatment of Mr. Collins fell below the standard of care ordinarily practiced by orthopedic surgeons and that this breach was a proximate cause or contributing cause of the injuries or complications and damages sustained by Mr. Collins. The jury awarded $30,000.00 for pain and suffering and $90,387.00 for past medical expenses. No other damages were awarded. A judgment incorporating the jury verdict was signed on October 11, 2011. Dr. Steiner was cast for $100,000.00 of the judgment together with court costs and legal interest. The PCF was cast for the balance of the judgment in the amount of $20,387.00 together with legal interest.

Both Mr. Collins and Dr. Steiner appealed the judgment. Mr. Collins complains about the award of damages. Dr. Steiner claims that the jury erred in finding that his breaches of the standard of care were substantial factors in the damages sustained by the Mr. Collins. Dr. Steiner also claims that the trial court erred in casting him with $100,000.00 of the total damages. He argues that $90,387.00 constituted a portion of the medical bills Mr. Collins incurred after the malpractice so

they constitute future medical expenses under La.R.S. 40:1299.43 and that the PCF should be liable for them.

Mr. Collins alleged that Dr. Steiner breached the standard of care owed to him by: (1) delaying treatment; and (2) using inadequate hardware resulting in a failed fixation of the radius. Mr. Collins contended that the development of compartment syndrome would have been discovered sooner if treatment had not been delayed, thereby avoiding permanent nerve and tissue damage. Mr. Collins also asserted that the delay in treatment increased the odds of sustaining a serious infection of the bone. Mr. Collins further claimed that the possibility of bone infection was increased by Dr. Steiner's use of an inadequate fixation on the radius.

Dr. Steiner has not appealed the finding that he breached the standard of care. Therefore, we now address his assignment of error regarding the relationship between his malpractice and Mr. Collins' damages.

### CONNECTION BETWEEN MALPRACTICE AND DAMAGES

Dr. Steiner complains that the jury erred in finding that his breaches of the standard of care caused any of the damages suffered by Mr. Collins. He argues that the evidence was insufficient to show that either his delay in treatment or his use of inadequate hardware was substantial factors in Mr. Collins' development of compartment syndrome, subsequent infection, or failure of the fixation.

The law imposes a duty on a patient to establish a causal connection between a doctor's alleged negligent conduct and his injuries. *Tiedeman v. Calvert*, 08-504 (La.App. 3 Cir. 12/10/08), 998 So.2d 1230, *writ denied*, 09-80 (La. 3/13/09), 5 So.3d 121 (citing *Pfiffner v. Correa*, 94-924, 94-963, 94-992 (La. 10/17/94), 643 So.2d 1228.) "The plaintiff need not show that the doctor's conduct was the only cause of harm, nor must all other possibilities be negated." *Id.* at 1234. In order to establish a causal connection, the plaintiff must prove "through medical testimony that it is more

probable than not that his injuries were caused by the substandard care." *Id*. A determination that there is a causal relationship between the malpractice and the injuries sustained should not be reversed absent manifest error. *Carter v. LA. Med. Mut. Ins. Co.*, 09-1310 (La.App. 3 Cir. 5/19/10), 40 So.3d 327.

All of the doctors who testified agreed that an open fracture increases the risk for developing an infection. They further agreed that an injury in a barnyard setting would also increase the risk for infection. All doctors, including Dr. Steiner, agreed that an open fracture requires early intervention.

It took Dr. Steiner almost eight hours to get to the hospital. Then it was another hour-and-a-half before surgery started. Dr. John DeLapp, Dr. William Overdyke, an orthopedic surgeon, and Dr. Charles Kennedy, also an orthopedic surgeon, all agreed that eight hours was considerably too long before Dr. Collins was evaluated by Dr. Steiner. Only Dr. John Noble, an orthopedic surgeon, testified that he would not delay ten hours past the injury to perform an exam and surgery.

Dr. DeLapp testified that this delay increased the risk of both infection and compartment syndrome and was one of the causes of Mr. Collins' resulting problems. Dr. DeLapp explained that compartment syndrome is a known complication of a forearm fracture. He testified that pain disproportionate to the injury is one of the main signs you look for in diagnosing a compartment syndrome. The fact that Mr. Collins' pain continued at the same high level despite being splinted and on narcotics is an indication that Mr. Collins might be developing compartment syndrome. Dr. DeLapp explained the compartment syndrome can be irreversible if not treated within six hours. Dr. DeLapp also testified that a nine out of ten pain indication as consistently related by Mr. Collins to the hospital staff should have raised a warning flag that he might be developing compartment syndrome.

According to Dr. DeLapp, the use of an inadequate plate reduced the probability of a good result. Dr. DeLapp testified that the use of an adequate-sized plate on Mr. Collins' radius would have increased the probability of good healing in the bone itself. Dr. DeLapp stated that the infection set in where the inadequate plate was located. Dr. DeLapp also explained that infection rates increase the longer you wait to set the bone.

Dr. Overdyke stated that an open fracture in a barnyard is an emergency. He also considered Dr. Steiner's fixation of the radius to be inadequate which increased the odds of a non-union of the bone. In this case, the open area on Mr. Collins' forearm was near the ulna which did not become infected. Dr. Overdyke did not believe that an inadequate fixation would cause an infection but was of the opinion that a single hematoma around both bones would contaminate both bones with infection and not just the bone that was near the opening.

Although Dr. Brinker did not offer an opinion as to any breaches of the standard of care by Dr. Steiner, he testified that the infection came at the time of the injury, especially considering that it occurred in a barnyard setting. He also stated that the report of swelling and a foul smell could be a sign of an ongoing infection. Dr. Brinker agreed that the major bone problems he saw were caused by a more chronic infection that had not just developed in the last few days before he treated Mr. Collins on September 8, 2003. Dr. Brinker explained that infected bone gets soft and mushy resulting in the screws in the hardware not holding as well. Dr. Brinker did agree that mismanagement of an infection would reduce Mr. Collins' chances of recovery. He also agreed that the use of the wrong size of hardware would further complicate things and reduce Mr. Collins' chances of a good union of the bone.

Dr. Kennedy testified that the problem with Mr. Collins' type of injury is the potential for compartment syndrome and for the fracture not to be reduced correctly.

He stated the fact that the wound was open required an aggressive early intervention to prevent these problems. He also agreed that the plate Dr. Steiner used on the radius was inadequate and that a longer plate should have been used. Dr. Kennedy opined that inadequate fixation in addition to the infection caused a nonunion of the radius. He surmised that the predominant cause of the nonunion was the inadequate reduction. He was also not surprised that an infection occurred with the delay. Dr. Kennedy suggested that an SED rate test should have been performed weekly to monitor for an infection. Dr. Kennedy testified that the failure to monitor Mr. Collins more closely and take a more vigilant approach about the infection was a deviation from the standard of care which resulted in the additional treatment that was required.

Dr. Kennedy stated that Mr. Collins' continued complaints of numbness and weakness were probably caused by a delay in treatment of the compartment syndrome. He explained that there is about a two-hour window to intervene when compartment syndrome is present. Dr. Kennedy testified that there would be a significant increase in the amount of pain if compartment syndrome was present.

Both Dr. Kyle Dickson, an orthopedic surgeon, and Dr. Noble were on the medical review panel and found no breach in the standard of care by Dr. Steiner. While Dr. Noble explained that some severe fractures do not get set until the next day, Dr. Dickson did not even consider that Mr. Collins had an open fracture. However, Dr. Dickson testified that he would not wait seven to eight hours to look at an open fracture, but if he waited longer it would not change his management of the case. Dr. Dickson agreed that with an open fracture there is a higher risk of both infection and non-union. Both Drs. Noble and Dickson agreed that pain out of proportion would be the number one concern for the development of compartment syndrome, although both doctors did not think that the documentation indicated that Mr. Collins developed compartment syndrome before it was discovered by Dr. Steiner. Dr. Noble did testify

10

that anyone who has pain that cannot be treated with adequate doses of morphine would be suspect for developing compartment syndrome. He testified that that it is a serious matter when a person's pain hits nine out of ten and should be taken seriously.

Mr. Collins testified that he never stopped hurting when he was transferred to a hospital room. Mr. Collins rated his pain a nine out of ten to Ms. Allen. When given morphine, his pain was a seven out of ten, which is after he had reported swelling and stiffness in his fingers. Mr. Collins later requested more pain medication.

Based on the above evidence, we can find no error in the jury's conclusion that Dr. Steiner's breaches of the standard of care in delaying treatment and using inadequate hardware caused the subsequent problems that Mr. Collins faced. There was ample testimony that the delay in treatment of the initial injury may have increased the chances for a serious infection in addition to the delay in discovering a developing compartment syndrome. Furthermore, the use of inadequate hardware created problems with the nonunion of the radius which was complicated by the developing infection. There was also testimony that Dr. Steiner may have delayed the discovery of the infection in his post-operative care. Meanwhile, the developing infection was eating away at Mr. Collins' radius.

## DAMAGES

Mr. Collins appealed the trial court judgment complaining about the amount of damages that he was awarded. He assigns errors concerning both the special and general damages awarded by the jury.

Special Damages

Mr. Collins alleges the jury erred in the amount of damages it awarded for both past and future medical expenses.

Special damages are those damages that can be determined with some degree of certainty and include past and future medical expenses. *Thibeaux v. Trotter*, 04-482

11

(La.App. 3 Cir. 9/29/04), 883 So.2d 1128, *writ denied*, 04-2692 (La. 2/18/05), 896 So.2d 31. "Medical expenses are a component of special damages." *Cormier v. Colston*, 05-507, p. 9 (La.App. 3 Cir. 12/30/05), 918 So.2d 541, 547. "The plaintiff bears the burden of proving special damages by a preponderance of the evidence." *Id.* An award of special damages is reviewed pursuant to the manifest error standard of review. *Id.* at 547-48.

Mr. Collins presented evidence that he had incurred medical expenses in the amount of $177,002.85 at the time of trial. Mr. Collins admits that $55,710.84 in medical expenses are attributable to the original injury caused by the bull and are not the result of Dr. Steiner's malpractice. However, he claims that the remaining $120,186.88 in medical expenses, which began with Dr. DeLapp's treatment, should have been awarded by the jury as past medical expenses. We agree.

The jury answered "Yes" to the following interrogatory:

Do you find, from a preponderance of the evidence, that the treatment rendered to **DONALD C. COLLINS** by **DR. DAVID H. STEINER**, fell below the standard of care ordinarily practice by orthopedic surgeons under similar circumstances **AND** that this breach in the standard of care was the proximate cause or a contributing cause of the injuries or complications and of the damages sustained by **DONALD C. COLLINS?**

The jury then awarded $90,387.00 in past medical expenses.

The jury obviously found that Dr. Steiner's malpractice resulted in the need for medical treatment past the original injury. There was sufficient evidence at trial to establish that but for Dr. Steiner's malpractice, Mr. Collins' may not have developed an infection, or at the very least the infection should have been discovered sooner, allowing for treatment before it destroyed the bone requiring an allograft. Based on the wording of the jury interrogatory, it is impossible to tell what damages the jury found to be the result of Dr. Steiner's malpractice. We can only assume that the jury found that all damages incurred by Mr. Collins requiring treatment by Dr. DeLapp

and Dr. Brinker were necessitated by Dr. Steiner's malpractice. Therefore, we will amend the judgment to increase the award of past medical damages to $120,186.88.

In reviewing the jury's failure to make an award for future medical expenses, we are mindful of the fact that "the plaintiff must show that, more probably than not, these expenses will be incurred and must present medical testimony that they are indicated and the probable cost of these expenses." *Id*. at 547.

Dr. Brinker testified that there is nothing more he can do for Mr. Collins. Dr. Kennedy agreed that Mr. Collins had reached maximum medical improvement. Only Dr. DeLapp testified that Mr. Collins would require additional medical treatment, but there was no specific testimony as to any type of procedure that was needed or the cost associated with any future medical treatment. Therefore, we find that the jury did not err in failing to award damages for future medical expenses.

General Damages

Mr. Collins complains the jury erred in awarding him only $30,000.00 for pain and suffering. Mr. Collins also claims that the jury erred in failing to award him anything for loss of enjoyment of life, disability, and loss of use of his arm.

"General damages are those which are inherently speculative in nature and cannot be fixed with mathematical certainty." *Miller v. LAMMICO*, 07-1352, p. 27 (La. 1/16/08), 973 So.2d 693, 711.

> An appellate court reviews a trial court's general damage award using the abuse of discretion standard. The trier of fact is afforded much discretion in independently assessing the facts and rendering an award because it is in the best position to evaluate witness credibility and see the evidence firsthand. An appellate court may disturb a damages award only after an articulated analysis of the facts discloses an abuse of discretion. To determine whether there has been an abuse of discretion by the fact finder, the reviewing court looks first to the facts and circumstances of the particular case. Only if a review of the facts reveals an abuse of discretion, is it appropriate for the appellate court to resort to a review of prior similar awards. In a review of the facts, the test is whether the present award is greatly disproportionate to the mass of past

awards for truly similar injuries. It is important to note, however, that prior awards are only a guide.

*Id*. (citations omitted).

Evidence revealed that Mr. Collins suffered with intense pain and anxiety for eight hours before he was even seen by Dr. Steiner. While he was given medication for the pain, he continually requested additional medication but could not receive any because enough time had not elapsed. Much of the time, his pain was reported as a nine out of ten. When Dr. Steiner finally arrived, Mr. Collins was not taken back to surgery until an hour and a half later.

Mr. Collins had to suffer through seven surgeries due to Dr. Steiner's malpractice. As a result of the compartment syndrome, Mr. Collins required an additional two surgeries by Dr. Steiner to close up the wounds that had to be left open to let the swelling go down. Subsequently, when Mr. Collins saw Dr. DeLapp, he was faced with yet another two surgeries to remove the hardware, debride the infected areas, and place antibiotic beads in the arm. Finally, Dr. Brinker performed three procedures on him which included debriding the arm and placing the allograft in the arm.

It was not until four years later that the allograft finally healed completely. During this time, Mr. Collins was unable to use his left hand and upper extremity for a year and a half. While Dr. Brinker testified that there is nothing more he can do for Mr. Collins' arm, he said Mr. Collins is faced with a lifetime of rehabilitation to get back to where he was before the accident.

In October 2010, Dr. DeLapp reevaluated Mr. Collins for the purposes of an assessment of his functional use of his left arm. A functional capacity evaluation was also performed. Dr. DeLapp explained that Mr. Collins had quite a bit of weakness diffusely throughout his upper extremity from the elbow down with diminished

sensation.  Mr. Collins was limited from exerting up to twenty pounds of force occasionally or ten pounds of force frequently.  Dr. DeLapp agreed that it would make it tough for Mr. Collins to perform his duties on the farm.  Dr. DeLapp admitted that Mr. Collins' disability was not determinable and it was not possible to tell how much Dr. Steiner's malpractice played into Mr. Collins' ultimate disability.

Mr. Collins testified that he experienced the worse pain that he has ever had due to his broken arm.  Mr. Collins testified that he is still bothered by his arm.  He has to sleep with it on a pillow.  Using the arm to lift or pull causes him pain.   Mr. Collins has a hard time doing activities that require the use of two hands.  Mr. Collins now has a hard time using a two-handle post hole digger when working on fences.  Another example would be the fact that he cannot open a sealed jar.  Mr. Collins testified that he had to sell all of his cattle because he is unable to take care of them.  Mr. Collins' family members who testified confirmed that he is not able to do things that he did before the accident.

Recognizing that Mr. Collins would have resulting pain and disability from the original injury, we find that he suffered for years due to the malpractice and that the jury abused its discretion in only awarding $30,000.00 in general damages.  In *Ernst v. Taylor*, 08-1289 (La.App. 3 Cir. 5/6/09), 17 So.3d 981, *writ denied*,  09-1262 (La. 9/18/09), 17 So.3d 977, this court found that $75,000.00 was an appropriate award of general damages for a plaintiff who suffered from Reflex Sympathetic Dystrophy of the left arm due to a cast which had been applied too tightly.  The plaintiff was seventy-three years old, suffered with the problem for seven years, became depressed because of her condition, suffered with ongoing pain, and was unable to do basic housework or hobbies.

We find that $100,000.00 is the lowest amount that we can reasonably award in the present case based on the evidence.  Mr. Collins could not use his left arm at all

for a year-and-a-half. It took the bone four years to finally heal. Mr. Collins still cannot perform duties that he once did and still has ongoing pain.

We also find that the jury erred in failing to make any award for loss of use of his arm and loss of enjoyment of life. Clearly, Mr. Collins could not use his arm for a year and a half. He also still has difficulties with every day events. We find that Mr. Collins failed to clearly establish what the resulting disability in his left arm is due to Dr. Steiner's malpractice as opposed to the original injury. Recognizing that Dr. Steiner's malpractice played a part in Mr. Collins' loss of use of his arm and loss of enjoyment of life, we find that that an appropriate award would be $30,000.00.

Allotment of Medical Expenses

Dr. Steiner argues that the trial court erred in signing a judgment allotting responsibility for medical expenses incurred after the date of injury to him as opposed to the PCF. Dr. Steiner alleges that the $90,387.00 for past medical expenses awarded by the jury should be considered future medical expenses because they occurred after the injury so they are the responsibility of the PCF.

Based on our discussion above, we have found that Mr. Collins is entitled to $130,000.00 in general damages in addition to $120,186.88 in medical expenses. Dr. Steiner is responsible for $100,000.00 plus interest pursuant to La.R.S. 40:1299.42(B). This finding pretermits our need to discuss this issue since the general damages award itself is over $100,000.00.

**DECREE**

For these reasons we amend the judgment to increase the award of medical expenses to $120,186.88. We also increase the award for pain and suffering to $100,000.00 and award an additional $30,000.00 for loss of use of the arm in addition to loss of enjoyment of life. All costs of this appeal are assessed to Dr. David Steiner.

**AFFIRMED AS AMENDED.**

16